**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**COLUMBUS DIVISION**

| | |
|---|---|
| RACHEL THOMPSON, on behalf of herself and all others similarly situated, | No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| KLARNA INC., | |
| Defendant. | |

Plaintiff Rachel Thompson ("Plaintiff" or "Ms. Thompson"), individually and on behalf of all others similarly situated, alleges as follows:

**I.    INTRODUCTION**

1.    A browser extension is a software program that adds functionality to a web browser.

2.    Coupon browser extensions, such as the one developed and used by Klarna Inc. ("Klarna" or "Defendant"), are widely used by online shoppers to identify coupons and discounts on products and services they have already added to their online shopping cart.

3.    Klarna promotes its coupon browser extension as a free tool that automatically searches the internet to identify coupons and discounts.

4.    This feature is appealing to consumers looking for discounts on products and services that they are already interested in purchasing and have already added to their cart.

5.    Klarna's coupon browser extension can be used on desktop and laptop computers, and it can also be used on mobile devices by downloading the Klarna mobile app.

6.    Over a million people in the United States have activated the Klarna coupon extension while making online purchases.

7.     However, the Klarna browser extension is designed to wrongfully divert commissions from online marketers and creators, including but not limited to website operators, online publications, YouTubers, bloggers, influencers, and other types of content creators ("Content Creators").

8.     Content Creators earn money by participating in affiliate marketing programs. As part of these programs, Content Creators are assigned unique affiliate marketing links and tracking tags, including affiliate marketing cookies.

9.     Correspondingly, online merchants use these tracking tags and affiliate marketing cookies to determine which Content Creator gets credit for referrals and earns sales commissions.

10.    Content Creators direct their followers and viewers to specific products or services via affiliate marketing links they share on their web platforms and social media channels.

11.    When someone clicks on a Content Creator's affiliate marketing link and makes a purchase, that specific Content Creator gets credit for the referral and earns a sales commission.

12.    However, the Klarna browser extension cheats these online marketers out of commissions they are entitled to by altering the checkout process and replacing their tracking tags and affiliate marketing cookies with Klarna's own tracking tags and affiliate marketing cookies.

13.    As described in more detail throughout this complaint, Klarna programmed the Klarna browser extension to systematically intercept and misappropriate commissions that belong to Content Creators like Ms. Thompson and members of the proposed Class.

14.    Klarna achieves this by substituting its own affiliate marketing cookies and tracking tags in place of Content Creators' affiliate marketing cookies and tracking tags, thereby

tricking the online merchant into awarding Klarna with commissions that should be due to Content Creators.

15.     Importantly, theft of these commissions happens even though the customer accessed the product or service through the Content Creator's specific affiliate marketing link and was, in every practical sense, referred to the product or service by the affiliate marketer and not by Klarna.

16.     Plaintiff is a Content Creator whose commission payments were wrongfully misappropriated by Klarna.

17.     Plaintiff brings this case individually and on behalf of all others similarly situated to recover the damages they have sustained and to enjoin Klarna's wrongful conduct, which is ongoing in nature and scope.

## II.     JURISDICTION

18.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from Klarna, there are more than one hundred Class members nationwide, and the aggregate amount in controversy exceeds $5,000,000.

19.     This Court has personal jurisdiction over Klarna because it maintains its principal place of business in Ohio.

20.     Venue is proper under 28 U.S.C. § 1391(a) through (d) because Klarna's headquarters and principal place of business is located in this District, Klarna resides in this District, and substantial parts of the events or omissions giving rise to the claims occurred in or emanated from this District, including, without limitation, decisions made by Klarna's governance and management personnel.

3

### III.    PARTIES

**A.    Plaintiff**

21.    Rachel Thompson is a Content Creator, and she is a citizen and resident of Dublin, California.

**B.    Defendant**

22.    Klarna Inc. is a Delaware corporation that is headquartered within this judicial district, specifically at 800 N. High Street, Suite 400, Columbus in Franklin County, Ohio.

### IV.    RELEVANT FACTS

**A.    Background**

**1.    Klarna Browser Extension**

23.    On December 9, 2021, Klarna announced its launch of the Klarna browser extension, which had been in beta testing with over 100,000 consumers.

24.    In the announcement, Klarna touted its automatic couponing feature's ability to save consumers time and money by instantaneously scraping the web for coupon codes and discounts, noting that "44% of online orders are placed on the desktop."[1]

25.    Klarna can be used on most major browsers, including Google Chrome.

26.    According to Google Chrome's web store, where users download Chrome browser extensions, Klarna's browser extension has at least 1 million users on Google Chrome alone.

---

[1] https://www.klarna.com/international/press/klarna-launches-browser-extension-allowing-consumers-to-pay-later-across-all-online-stores/#:~:text=New%20York%20%E2%80%93%20December%209%2C%202021,testing%20with%20over%20100%2C000%20consumers. (last visited Feb. 5, 2025).

27.     Similarly, according to the Apple App Store, over 1.2 million individuals have downloaded the Klarna App.

28.     Based on these figures alone, there are millions of individuals using Klarna each day, and Klarna is misappropriating commission payments during millions of online transactions each month by replacing affiliate marketing cookies and marketing tags.

### 2.     Online Marketers and the Commission System

29.     With the rise of e-commerce and social media and the increasing popularity of platforms like YouTube, Instagram, and TikTok, several retailers have turned to Content Creators to promote and market their products to consumers.

30.     Content Creators make commissions by directing their readers and/or followers to affiliate marketing links that they publish or share on their various platforms and social media channels.

31.     Affiliate marketing links are web-based hyperlinks that direct consumers to a website where they can purchase the product or service the Content Creator is promoting.

32.     Online vendors and E-commerce merchants use tracking tags to determine whether a consumer has used a Content Creator's affiliate marketing link to access the E-commerce website and purchase the specific product or service that the Content Creator is promoting.

33.     This process allows E-commerce merchants to attribute sales to whichever Content Creator is responsible for the referral, thereby crediting the specific Content Creator and providing them with a commission payment.

**B.    Klarna's Misappropriation of Online Marketer Commissions**

34.    Unbeknownst to Plaintiff and Class Members, Klarna uses the Klarna browser extension to manipulate online shoppers' website traffic and network traffic transmissions.

35.    More specifically, Klarna surreptitiously alters the tracking tags and affiliate marketing cookies that are transmitted during the checkout process, removing the Content Creator's tags and substituting its own tags.

36.    By displacing the tracking tags that point to specific Content Creators as the source of the referral and substituting its own tags, Klarna holds itself out as the referrer of the specific products and services.

37.    This process allows Klarna to wrongfully take credit for sales commissions it did not earn, which emanated from Content Creator's unique marketing affiliate links.

38.    Analysis of network traffic on websites where the Klarna browser extension is running reveals electronic transmissions and communications between an online shopper's web browser, the given website, and other third parties.

39.    Notably, network traffic is typically invisible to ordinary website users, which explains how Klarna's theft has—until now—gone undetected.

40.    Reviewing network traffic demonstrates that, when an online shopper activates the Klarna browser extension, it silently and invisibly removes affiliate cookies and tracking tags that would otherwise credit the rightful salesperson—the Content Creator—with the sale of that particular product or service.

41.    The images below illustrate what happens when an online shopper wants to purchase a product or service a specific Content Creator is promoting.

6

42.     First, the user clicks on the Content Creator's (Linus Tech Tips) affiliate marketing link for greenmangaming.com and adds an item to their shopping cart.

43.     Upon doing so, the Content Creator's affiliate marketing tag attaches to the shopping session.

44.     Next, as shown in Figure 1, the Content Creator's affiliate marketing tag (the "_entry" cookie) is persistent and continues to credit "Linus Tech Tips" with the sale when the user proceeds to the checkout page to complete their purchase.



**Figure 1. The screenshot was taken during the checkout process at greenmangaming.com after having navigated to the website from the online marketer's affiliate marketing link.**

45.     But whether Linus Tech Tips will be credited with the referral and commission ultimately depends on whether the online shopper activates the Klarna browser extension.

46.     Figure 1 shows the online merchant's website markup (left), which is what ordinary website visitors see, and the inspection panel (right) provides a glimpse into what is happening behind the scenes before activating the Klarna browser extension.

7

47.     At checkout, Klarna creates a pop-up (shown in Figure 2 below), alerting the user that "Coupon and points available!" thereby enticing the shopper to click the "Apply Coupon" button.



**Figure 2. Zoomed-in Screenshot of Figure 1.**

48.     If the user clicks the "Apply Coupon" button shown in Figure 2, the Klarna browser extension is activated, and it replaces the influencer's affiliate marketing cookies with Klarna's own affiliate marketing cookies as shown in Figure 3 below.



**Figure 3. Screenshot of network traffic and cookie attribution after the user activated the Klarna browser extension by clicking "Apply Coupon."**

8

49. Unfortunately, for the Content Creator (Linus Tech Tips), Klarna has replaced his affiliate marketing cookie and substituted its own.

50. As a result, the "_entry" cookie value now reads "utm_source=Klarna Bank AB" (shown in Figure 4 below) instead of "utm_source=Linus Tech Tips" (shown in Figure 5).



**Figure 4. Screenshot showing the _entry cookie value after the Klarna browser extension is activated.**



**Figure 5. Screenshot of the _entry cookie value prior to activating the Klarna browser extension.**

51. Unfortunately for the online shopper, Klarna did not provide them with any savings. As shown by Klarna's pop-up notification in Figure 6, explaining "You have the best price!" and further explaining "We add new coupons all the time, so make sure to try again soon!"



**Figure 6. Screenshot of Klarna's pop-up explaining that the browser extension did not identify any viable coupons.**

52. In this scenario, Klarna gets credit for the referral and ultimate purchase of the product even though it did not help the online shopper identify the product, nor did it provide the online shopper with any additional discount or coupon for the product.

53. Klarna provided a lose-lose scenario for both the Content Creator and the online shopper.

**C.    Klarna's Exploitation of Last-Click Attribution and Affiliate Marketing**

54. When an online shopper clicks on a Content Creator's affiliate marketing link, a tracking tag is generated that allows the online merchant to know who to credit with the referral and commission for the sale.

55. The tracking tag is saved on the online shopper's browser in the form of a cookie that will expire sometime in the future, commonly between 2–30 days, which varies depending on the particular affiliate program.

56. This attribution system is intended to ensure that, even if it takes a few days for the online shopper to complete their purchase, the Content Creator will still get credit for the sale.

57. The industry standard for crediting specific Content Creators with sales—i.e. determining who earns commission—is called "last-click attribution."

58. Under last-click attribution, the last affiliate marketing link the user clicks before completing their purchase gets credited for the ultimate sale of the product or service.

59. Klarna purposely designed its browser extension to exploit the last-click attribution process, and it achieves this by producing pop-ups during the checkout process in order to simulate referral clicks.

60.     Stated differently, Klarna has designed its browser extension in a manner that requires users to actively engage with the browser extension—i.e., click buttons—to receive a discount, test coupons, or earn "cash back."

61.     These clicks are important to Klarna because without them Content Creators get credit for sales and referrals emanating from the Content Creator's affiliate marketing links.

62.     Even if a shopper has downloaded and installed the Klarna browser extension, Klarna only gets to misappropriate commission payment from Content Creators when the online shopper activates the Klarna extension via one of its many pop-ups.

63.     Accordingly, Klarna's goal is to entice online shoppers to activate Klarna even when the browser extension has not identified any coupons and even when Klarna has absolutely nothing to offer the online shopper in the way of a discount.

64.     As shown in Figure 2 and the images below, Klarna entices shoppers to activate the Klarna browser extension by offering coupon codes and a pseudo-cash-back scheme wherein shoppers can earn points for purchasing products already in their online shopping cart.

65.     Shoppers can activate Klarna by clicking on any of the pop-ups that it produces and the buttons within those pop-ups, such as the "Apply Coupon" button (shown in Figure 2), the "Activate," "Try," and "Copy" code buttons (shown in Figure 10).

66.     In each of these scenarios, Klarna displaces the rightful referrer and claims commission credit for sales Klarna did not influence, much less generate.

67.     To make matters worse, Klarna not only claims credit for sales when it successfully identifies a coupon or provides the user with "cash back points" but also misappropriates sales commissions where (1) it failed to provide a relevant or functional coupon

despite the statements in its pop-ups; and (2) failed to provide cash back points despite its statements to the contrary about their availability.

**D.    Plaintiff's Experience**

68.    Rachel Thompson is a Content Creator who has earned commission payments from affiliate marketing links shared on her social media pages (_soloherself).

69.    Ms. Thompson would have earned more income in the form of commission payments but for Klarna's scheme to usurp affiliate marketing commissions.

70.    Klarna, via its browser extension, stole credit for sales and commissions that Ms. Thompson originated through her own platforms, emanating from the affiliate marketing links she shared with her follower base.

**E.    Damages & Harm**

71.    Plaintiff and Class Members were harmed by Klarna's conduct because the Klarna browser extension systematically misappropriates commission payments from their rightful owners—i.e., the individual who promoted and shared the affiliate link and generated the referral and ultimate sale of a product or service.

72.    Plaintiff promotes products via her social media channels and posts affiliate marketing links to those products.

73.    For example, she has affiliate marketing links with Walmart.com, and her referral tag is set as an "AID" cookie. An "AID" cookie is a type of cookie that corresponds to the specific affiliate marketing program (Walmart), and the value (which is a string of unique numbers) identifies the specific Content Creator who shared the affiliate marketing link with their followers.

74.    As shown in Figures 7 and 8, in the case of Ms. Thompson, the AID cookie's numerical value is 1390754.

75.    When one of Ms. Thompson's followers clicks on her affiliate marketing link and adds a product to their online shopping cart at Walmart.com, her AID cookie attaches to the shopping session.



**Figure 7. Screenshot taken from Walmart.com after the online shopper clicks on Ms. Thompson's affiliate marketing link and adds the item to their shopping cart.**

76.    As shown below, Ms. Thompson's AID cookie (wmlspartner=imp_1390754) has attached to the online shopper's web browser, thereby attributing the referral to her.



**Figure 8. Zoomed-in screenshot of Figure 7 showing that Ms. Thompson's affiliate marketing cookie attaches to properly credit her with the referral and ultimate sale.**

77.     When the user proceeds to checkout by clicking the "buy now" button shown in the image above, her AID cookie (wmlspartner=imp_1390754) persists and continues to attribute the referral and sale to her.

78.     The image below demonstrates that, so long as the online shopper does not activate the Klarna extension by clicking "Activate" or "Try" one code available, she will be credited with the sale and corresponding commission payment once the checkout process is complete.



**Figure 9. Screenshot showing that when the Klarna browser extension has not been activated during checkout, Ms. Thompson's affiliate marketing cookie persists through the checkout process to credit her with the referral and ultimate sale of the product.**



**Figure 10. Zoomed-in screenshot of Figure 9 showing that the Klarna browser extension has not been activated yet, but Klarna is prompting the shopper with a pop-up, enticing them to click the "Activate" or "Try" buttons.**



**Figure 11. Zoomed-in image of Figure 9 showing that, even though the user has installed the Klarna browser extension, Ms. Thompson's affiliate marketing cookie will still credit her with the sale so long as the user does not activate the Klarna browser extension.**

79.    But as depicted in the images below, if the user activates the Klarna browser extension during the checkout by clicking "Activate" or "Try" one code available, Klarna wrongfully removes Ms. Thompson's AID cookie (wmlspartner=imp_1390754) and replaces it with its own AID cookie (wlmspartner=imp_115633), thereby wrongfully taking credit for the referral and corresponding commission payment for that particular sale.



**Figure 12. Screenshot showing that, upon clicking the "Activate" button, Klarna replaces Ms. Thompson's AID cookie with its own AID cookie.**



**Figure 13. Zoomed in screenshot of Figure 12.**

80.     In the scenario above, Klarna failed to identify any relevant coupon codes or savings, but it nonetheless claimed credit for the referral and corresponding sales commission that is rightfully owed to Ms. Thompson, the Content Creator who hosted and promoted the affiliate marketing link.

*       *       *

81.     Plaintiff and Class Members invest their valuable resources into cultivating their respective follower bases and promoting products and services via affiliate marketing links.

82.     Plaintiff and Class Members rely on the stream of income they generate through their work as a Content Creators and from the commissions that they earn, or were supposed to earn, via affiliate marketing partnerships and affiliate marketing links.

83.     Plaintiff and Class Members were harmed by Klarna, which—via the Klarna browser extension—deprived them of referral fees and sales commissions they were and are rightfully entitled to.

84.     The Klarna browser extension is activated during millions of online purchases each year. In the absence of the Klarna browser extension, Plaintiff and Class Members would have earned more money in the form of referral fees and sales commissions from their respective affiliate marketing links.

85.     Plaintiff continues to devote time and energy to content creation to generate commissions. Plaintiff and Class Members face future harm in the form of stolen referral fees and sales commissions because the Klarna browser extension continues to misappropriate affiliate marketing commissions with each passing day.

## V.     CLASS ALLEGATIONS

86.     Plaintiff, on behalf of herself and as a class action under the Federal Rules of Civil

Procedure, Rule 23(a), (b)(1), (b)(2), (b)(3), and (c)(4), seeks damages and injunctive relief on behalf of the members of the following Class and constituent Subclass (collectively, the "Class"):

> **Nationwide Class:** All persons in the United States who participated in an affiliate commission program with a United States eCommerce merchant and had commissions diverted to Klarna as a result of the Klarna browser extension.

> **California Subclass:** All persons in California who, participated in an affiliate commission program with a United States eCommerce merchant and had commissions diverted to Klarna as a result of the Klarna browser extension.

87.    Excluded from the Class are Defendant and its officers, directors, management, employees, subsidiaries, or affiliates. Also excluded are the district judge or magistrate judge to whom this case is assigned, as well as those judges' immediate family members.

88.    **Numerosity:** Members of the Class are so numerous that joinder is impracticable. There are at least tens of thousands of members of the Class, geographically dispersed throughout the United States, such that joinder of all Class members is impracticable. There are at least thousands of members of the Subclass, such that joinder of all Subclass members is likewise impracticable.

89.    **Typicality:** Plaintiff's claims are typical of the claims of the other Class members. The factual and legal bases of Defendant's liability are the same and resulted in injury to Plaintiff and all other members of the Class.

90.     **Adequate representation:** Plaintiff will represent and protect the interests of the Class both fairly and adequately. Plaintiff has retained counsel competent and experienced in complex class-action litigation, and she has no interests that are antagonistic to those of the Class. Plaintiff's interests do not conflict with the interests of Class members she seeks to represent.

91.     **Commonality and Predominance:** Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members because Defendant has acted on grounds generally applicable to the Class and because Class members share a common injury. Thus, determining damages with respect to the Class as a whole is appropriate. The common applicability of the relevant facts to the claims of Plaintiff and the proposed Class are inherent in Defendant's wrongful conduct because the injuries incurred by Plaintiff and each member of the Class arose from the same conduct alleged herein.

92.     There are common questions of law and fact specific to the Class that predominate over any questions affecting individual members, including:

  a. Whether Defendant programmed and designed the Klarna browser extension in a manner that wrongfully credits it with sales referrals and commissions;

  b. Whether the scheme described herein results in Klarna being awarded commission payments it did not rightfully earn;

  c. Whether Klarna was unjustly enriched to the detriment of Plaintiff and Class Members in the form of commission payments;

  d. Whether Defendant, through the actions alleged in this complaint, violated consumer protection laws in the state of California;

e. Whether consumers and Class members have been damaged by Defendant's conduct; and

f. The nature and scope of appropriate injunctive relief.

93. **Superiority:** Class proceedings on these facts are superior to all other available methods for the fair and efficient adjudication of this controversy, given that joinder of all members is impracticable. Even if members of the Class could sustain individual litigation, that course would not be preferable to a class action because individual litigation would increase the delay and expense to the parties due to the complex factual and legal controversies present in this matter. Here, the class action device will present far fewer management difficulties, and it will provide the benefit of a single adjudication, economies of scale, and comprehensive supervision by this Court. Further, uniformity of decisions will be ensured.

94. Class certification is also appropriate under Rules 23(b)(1), (b)(2), and/or (c)(4) because:

- The prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for Defendant;

- The prosecution of separate actions by individual Class Members would create a risk of adjudications that would, as a practical matter, be dispositive of the interests of other Class Members not parties to the adjudications, or would substantially impair or impede their ability to protect their interests;

- Defendant has acted or refused to act on grounds generally applicable to the Class, making injunctive and corresponding declaratory relief appropriate with respect to the Class as a whole; and

- The claims of Class Members are comprised of common issues whose resolution in a class trial would materially advance this litigation.

**TOLLING OF THE STATUTES OF LIMITATIONS**

95.    All applicable statute(s) of limitations have been tolled by Defendant's knowing and active concealment and denial of the facts alleged herein. Plaintiff and Class Members could not have reasonably discovered Defendant's practice of displacing their affiliate marketing tracking tags and cookies, surreptitiously manipulating network transmissions, and allowing Klarna to take credit for sales commissions it did not earn.

96.    Defendant was and is under a continuing duty to disclose to Plaintiff and Class Members their practice of displacing tracking tags that point to influencers as the source of a referral and substituting their own tracking tags to appropriate commissions that belong to influencers like Plaintiff and Class members. As a result of the active concealment by Defendant, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

**VI.    CAUSES OF ACTION**

**FIRST CLAIM FOR RELIEF**
**UNJUST ENRICHMENT**
**(ON BEHALF OF THE NATIONWIDE CLASS)**

97.    Plaintiff incorporates the above allegations by reference as if fully set forth herein.

98.    Plaintiff lacks an adequate remedy at law.

99.    Plaintiff and Class members have an interest, both equitable and legal, in the referral fees and commission payments to which they were wrongfully deprived. These payments were rightfully earned by Plaintiff and Class members, not Klarna.

100.     Klarna benefitted from the referral fees and commission payments that were credited to it as a function of the Klarna browser extension wrongfully claiming credit for commissions via last-click attribution.

101.     Klarna understood that it so benefitted, and it also understood and appreciated that the Klarna browser extension would cause the harm described herein.

102.     But for Klarna's unjust and improper use of the browser extension, it would not have been credited and awarded commission on sales that emanated from Plaintiff's and Class Members' respective affiliate marketing links.

103.     As a result of Klarna's wrongful conduct as alleged in this Complaint, it has been unjustly enriched at the expense of, and to the detriment of, Plaintiff and Class members.

104.     Klarna continues to benefit and profit from the browser extension while Plaintiff and Class members continue to have their rightful commission payments diverted to Klarna.

105.     Klarna's unjust enrichment is traceable to, and resulted directly and proximately, from the conduct alleged herein, including by using the Klarna browser extension to wrongfully credit itself with referrals and commissions it did not rightfully earn.

106.     The benefit conferred upon, received, and enjoyed by Klarna was not conferred officiously or gratuitously, and it would be inequitable and unjust for Klarna to retain the benefit.

107.     Equity and good conscience militate against permitting Klarna to retain the profits and benefits from its wrongful conduct, which should be restored to Plaintiff and Class Members.

**SECOND CLAIM FOR RELIEF**
**VIOLATION OF CALIFORNIA'S BUSINESS AND PROFESSIONS CODE,**
**CAL. BUS. & PROF. CODE § 17045, ET SEQ.**
**(ON BEHALF OF THE CALIFORNIA SUBCLASS)**

108.     Plaintiff incorporates the above allegations by reference as if fully set forth herein.

109.    Section 17045 prohibits the "secret payment or allowance of rebates, refunds, commissions, or unearned discounts, whether in the form of money or otherwise, or secretly extending to certain purchasers special services or privileges not extending to all purchasers purchasing upon like terms and conditions, to the injury of a competitor and where such payment or allowance tends to destroy competition."

110.    By secretly and unlawfully displacing Plaintiff and other class members' affiliate marketing cookies with its own as part of Klarna's coupon generation and cashback rewards program, Klarna ensured that it would be paid "secret . . . commissions" by Merchants, to the detriment of competition.

111.    This payment of secret commissions has directly harmed Plaintiff and other Class members since the secret commissions themselves represent the diversion of Plaintiff and other Class members' earnings to Klarna.

112.    Klarna's conduct, including but not limited to the fact that it designed, planted, and programmed Klarna to misappropriate commissions from Plaintiff and Class members, is a direct detriment to competitors engaged in affiliate marketing, is injurious to Klarna's competitors, including Plaintiff and other Class members, "tends to destroy competition," and is unlawful.

**THIRD CLAIM FOR RELIEF**
**VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW,**
**CAL. BUS. & PROF. CODE § 17200, ET SEQ.**
**(ON BEHALF OF THE CALIFORNIA SUBCLASS)**

113.    Plaintiff incorporates the above allegations by reference as if fully set forth herein.

114.    Plaintiff lacks an adequate remedy at law.

115.    California's Unfair Competition Law (UCL) defines "unfair competition" to include any "unlawful, unfair, or fraudulent" business act or practice. Cal. Bus. & Prof. Code §§ 17200 et seq.

116.    Klarna has engaged in acts and practices that are unfair in violation of the UCL.

117.    Klarna is a "person" as defined by Cal. Bus. & Prof. Code §17201.

118.    Klarna committed unfair business practices by using the Klarna browser extension to wrongfully take credit for sales referrals on purchases made in the state of California and thereby received commission payments that rightfully belonged to Plaintiff and members of the California Subclass.

119.    Klarna's conduct is unfair in violation of the UCL because it violates California's public policy against interfering with another's prospective economic advantage. *See* 5 Witkin, Summary 11th Torts § 854 (2024).

120.    Klarna wrongfully deprives Plaintiff and Class Members of monies they rightfully earned as the true originators of sales arising from affiliate marketing links.

121.    The gravity of harm resulting from Klarna's practice of appropriating commissions that belong to influencers like Plaintiff and Class members outweighs any potential utility therefrom. Klarna's conduct set forth in this Complaint violates public policy and is unscrupulous, offensive, and substantially injurious.

122.    Klarna actually and proximately caused harm to Plaintiff and Subclass members in that, among other things, they suffered economic injury by being deprived of commissions they should have earned from referrals through their affiliate links.

123.    The conduct alleged herein is continuing and there is no indication that Klarna will cease such activity in the future.

124. Klarna's conduct in violation of the UCL has caused Plaintiff and members of the California Subclass to be deprived of referral fees and commission payments for sales they rightfully originated. Plaintiff and the members of the California Subclass thus suffered lost money or property as a result of Klarna's conduct.

125. Plaintiff therefore seeks restitution, an injunction, and all other appropriate relief in equity, including reasonable attorneys' fees and costs of suit.

**FOURTH CLAIM FOR RELIEF**
**TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**
**(ON BEHALF OF THE NATIONWIDE CLASS)**

126. Plaintiff incorporates the above allegations by reference as if fully set forth herein.

127. Plaintiff and Class members are engaged in an economic relationship with eCommerce merchants by referring their followers to those merchants through affiliate links. In return, eCommerce merchants provide Plaintiff and Class members with referral fees or commissions. These relationships are ongoing, and Plaintiff and Class members expect to continue earning commissions in exchange for referrals.

128. Klarna is aware of the referral and commission relationship between Plaintiff and Class members on the one hand and eCommerce merchants on the other hand.

129. Through the use of the Klarna browser extension, Klarna misappropriates commission payments from Plaintiff and Class members who promoted and shared an affiliate link and generated the referral and ultimate sale of an eCommerce merchant's product or service. Specifically, Klarna displaces tracking tags that identify online marketers as the source of the referral, substitutes its own tracking tags, and holds itself out as the referrer of the specific products and/or services even though the sale in question emanated from a content creator's affiliate marketing link.

130. Klarna either intended to usurp commissions from Plaintiff and Class members through the conduct alleged herein or knew that its conduct would appropriate commissions and referral fees.

131. Plaintiff and Class Members were harmed by Klarna's conduct because the Klarna browser extension deprived Plaintiff and Class Members of monies they rightfully earned as the true originators of sales arising from their affiliate marketing links.

132. Klarna's conduct was a substantial factor in causing harm to Plaintiff and Subclass members in that, among other things, they suffered economic injury by being deprived of commissions they should have earned from referrals through their affiliate links.

133. As a result of the above conduct, Klarna is liable to Plaintiff and Class members for damages in an amount to be determined at trial.

**FIFTH CLAIM FOR RELIEF**
**CONVERSION**
**(ON BEHALF OF THE NATIONWIDE CLASS)**

134. Plaintiff incorporates the above allegations by reference as if fully set forth herein.

135. Plaintiff and Class Members possessed or had a right to possess commissions they earned from referring consumers to products and services sold by eCommerce merchants. The amount of each commission constituted a specific and identifiable sum.

136. Klarna intentionally and substantially interfered with Plaintiff's and Class members' personal property by usurping commissions and referral fees owed to Plaintiff and Class members.

137. Klarna, without proper authorization, assumed and exercised the right of ownership over these commissions, in hostility to the rights of Plaintiff and Class members, without justification.

138.     Klarna's wrongful exercise of control over Plaintiff's and Class members' personal property constitutes conversion.

139.     Plaintiff and Class members neither assented to nor ratified Klarna's interference with their commissions.

140.     As a direct and proximate result of Klarna's conversion, Plaintiff and Class members were harmed.

141.     Klarna is liable to Plaintiff and Class members for damages and costs permitted by law.

**SIXTH CLAIM FOR RELIEF**
**VIOLATION OF CALIFORNIA'S COMPREHENSIVE COMPUTER**
**DATA ACCESS AND FRAUD ACT,**
**CAL. PENAL CODE § 502, ET SEQ.**
**(ON BEHALF OF THE CALIFORNIA SUBCLASS)**

142.     Plaintiff incorporates the above allegations by reference as if fully set forth herein.

143.     Cal. Penal Code § 502(c)(1) makes it an offense when a person: "Knowingly and without permission alters, damages, deletes, destroys, or otherwise uses any data, computer, computer system, or computer network in order to either (A) devise or execute any scheme or artifice to defraud, deceive, or extort, or (B) wrongfully control or obtain money, property, or data."

144.     Klarna violated Cal. Penal Code § 502(c)(1) when it accessed Plaintiff's and Subclass members' affiliate tracking cookie information and tracking tags, deleted them, and replaced them with Klarna's own affiliate tracking cookie information and tracking tags and thereby defrauded and deceived or wrongfully obtained money or property belonging to Plaintiff and Subclass members.

145.    Cal. Penal Code § 502(c)(4) makes it an offense when a person: "Knowingly accesses and without permission adds, alters, damages, deletes, or destroys any data, computer software, or computer programs which reside or exist internal or external to a computer, computer system, or computer network."

146.    Klarna violated § 502(c)(4) when it accessed Plaintiff's and Subclass members' affiliate tracking cookie information and tracking tags, deleted them, and replaced them with Klarna's own affiliate tracking cookie information and tracking tags, and thereby altered and destroyed data belonging to Plaintiff and Subclass members.

147.    Cal. Penal Code § 502(e)(1) provides a private right of action for "the owner or lessee of the . . . data who suffers damage or loss by reason of a violation of any of the provisions of subdivision (c)[.]"

148.    Plaintiff and members of the California Subclass were the owners of the data who suffered damage or loss as a result of Klarna's conduct. Klarna's acts and practices have caused Plaintiff and members of the California Subclass to be deprived of referral fees and commission payments for sales they rightfully originated. Plaintiff and the members of the California Subclass thus suffered damages and loss as a result of Klarna's conduct.

149.    Plaintiff and members of the California Subclass seek compensatory damages in accordance with Cal. Penal Code § 502(e)(1), in an amount to be proved at trial, and injunctive or other equitable relief.

150.    Plaintiff and members of the California Subclass have also suffered irreparable and incalculable harm from Klarna's violations of this section, which will continue unless Klarna is enjoined from further violations of this section. Plaintiff and Subclass members have no adequate remedy at law.

151.    Plaintiffs and members of the California Subclass are also entitled to punitive or exemplary damages pursuant to Cal. Penal Code § 502(e)(4) because Klarna's violations were willful and, upon information and belief, Klarna is guilty of oppression, fraud, or malice as defined in Cal. Civil Code § 3294. Plaintiff and members of the California Subclass are also entitled to recover their reasonable attorneys' fees under Cal. Penal Code § 502(e)(2).

## VII.    JURY DEMAND

152.    Plaintiff demands a trial by jury on all issues so triable.

DATED this 10th day of February, 2025.

s/Daniel R. Karon
Daniel R. Karon (0069304)
**KARON LLC**
700 W. St. Clair Ave., Suite 200
Cleveland, OH 44113
Telephone: (216) 622-1851
dkaron@karonllc.com

Gary M. Klinger (*pro hac vice* forthcoming)
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Telephone: (866) 252-0878
gklinger@milberg.com

Alexandra M. Honeycutt (*pro hac vice* forthcoming)
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
800 S. Gay St., STE 1100
Knoxville, TN 37929
Telephone: (866) 252-0878
ahoneycutt@milberg.com

E. Michelle Drake
(*pro hac vice forthcoming*)
**BERGER MONTAGUE PC**
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
Tel.: 612-594-5999
Fax: 612-584-4470
emdrake@bm.net

Norman E. Siegel (*pro hac vice* forthcoming)
Barrett J. Vahle (*pro hac vice* forthcoming)
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone: (816) 714-7100
siegel@stuevesiegel.com
vahle@stuevesiegel.com

Adam E. Polk (*pro hac vice* forthcoming)
Anthony Rogari (*pro hac vice* forthcoming)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, California 94108
Telephone: (310) 877-7034
apolk@girardsharp.com
arogari@girardsharp.com

***Attorneys for Plaintiff***