**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**COLUMBUS DIVISION**

AHNTOURAGE MEDIA LLC, DANIEL PEREZ, JAMES GATLIN LLC, and DAN BECKER LLC, individually and on behalf of all others similarly situated,

Plaintiff,

v.

KLARNA INC.,

Defendant.

No. 2:25-cv-00124-MHW-KAJ

**AMENDED CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs Ahntourage Media LLC, Daniel Perez, James Gatlin LLC, and Dan Becker LLC (“Plaintiffs”), individually and on behalf of all others similarly situated, bring this action against Klarna, Inc. (“Klarna” or “Defendant”), and allege as follows:

## I. INTRODUCTION

1. Online content creators, such as journalists, bloggers, podcasters, and YouTubers (“Affiliate Marketers”) earn revenue by promoting the products and services of e-commerce merchants (“Merchants”) to their online audiences. Pursuant to partnerships between Affiliate Marketers and Merchants, when a consumer clicks on an Affiliate Marketer’s affiliate link and then purchases a product or service on the Merchant’s website, the Merchant is supposed to pay a commission for that sale (“Affiliate Commission”) to the Affiliate Marketer whose link was followed to the Merchant’s website. The Merchant is able to identify which Affiliate Marketer referred the consumer to the Merchant’s website based on unique identifiers (“Affiliate ID”) contained in the affiliate link associated with the sale.

2. Unbeknownst to Plaintiffs and other Affiliate Marketers, however, Klarna has been surreptitiously and deliberately interfering with the economic relationships between

Affiliate Marketers and at least tens of thousands of online merchants. Through a browser extension that it owns and operates (the "Klarna Browser Extension"), Klarna has been taking Affiliate Commissions that properly belong to the Affiliate Marketers. Through use of the Klarna Browser Extension, Klarna overwrites the Affiliate Marketer's Affiliate ID with Klarna's own Affiliate ID during the consumer's checkout process, thus diverting the Affiliate Commission to itself, even though it did not promote the Merchant's product or refer the consumer to the Merchant's website to make the purchase. By virtue of this practice, Klarna has misappropriated and continues to misappropriate Affiliate Commissions from thousands of Affiliate Marketers. As of the date of this filing, the Klarna Browser Extension continues to overwrite and displace Affiliate Marketers' Affiliate IDs with Klarna's Affiliate ID on the websites of major Merchants such as Staples, Target, and Walmart, as well as on websites for thousands of smaller Merchants.

3. Plaintiffs are Affiliate Marketers who use websites and social media platforms such as YouTube, Facebook, TikTok, and Instagram to promote products sold by Merchants to their followers. When a consumer clicks one of the Plaintiff's affiliate links, the consumer is redirected to the Merchant's website. If that consumer makes a purchase on that Merchant's website, the Plaintiff associated with that affiliate link is supposed to earn an Affiliate Commission from the Merchant.

4. When a consumer clicks an affiliate link, the Affiliate Marketer's unique Affiliate ID is inserted within the web link URL that sends consumers to the Merchant's website. The website receives the Affiliate ID in the link and immediately stores the Affiliate ID, often as a "cookie" (a persistent data file or record stored in the browser specific to the website). This process allows the Merchant to properly identify and pay the Affiliate Commission to the Affiliate Marketer who referred the consumer to the Merchant's product.

5. Klarna launched the Klarna Browser Extension in December 2021, following its purchase of Piggy, a popular browser extension that offered automatic coupons and cashback. The Klarna Browser Extension purports to search for available coupon codes, offer points that can be redeemed for Klarna cashback rewards ("cashback"), and provide access to Klarna's deferred payment options. Consumers who download the Klarna Browser Extension will see a pop-up when they access certain Merchant websites. If they click on the pop-up, the Klarna Browser Extension ostensibly will tell them if there is an available discount code or if they can get cashback on their purchase through the points program.

6. The Klarna Browser Extension, however, is designed and used by Klarna to misappropriate millions of dollars in Affiliate Commissions from Plaintiffs and other Affiliate Marketers. When a consumer is directed to a Merchant's website by an Affiliate Marketer and that consumer interacts with the Klarna Browser Extension, the Klarna Browser Extension secretly replaces the Affiliate Marketer's Affiliate ID with Klarna's own Affiliate ID, and the Affiliate Commission that should be paid to the Affiliate Marketer is redirected to Klarna. Klarna overwrites and swaps in its Affiliate ID even though Klarna (1) had no role in marketing the product to the consumer and (2) did not refer the consumer or otherwise generate the sale. Through this process, Klarna misappropriated millions of dollars in Affiliate Commissions that Plaintiffs and other Affiliate Marketers rightfully earned.

7. Plaintiffs, on behalf of themselves and the proposed Class and State Subclasses, seek monetary relief and equitable relief, including an order enjoining Klarna from using the Klarna Browser Extension to misappropriate Affiliate Commissions.

## II. JURISDICTION

8. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from Klarna, there are more than one hundred Class members nationwide, and the aggregate amount in controversy exceeds $5,000,000. This Court also has jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

9. This Court has personal jurisdiction over Klarna because Klarna maintains its principal place of business in Columbus, Ohio, does business in Ohio, and has sufficient minimum contacts with Ohio such that it has intentionally availed itself of the state's laws.

10. Venue is proper under 28 U.S.C. § 1391(a) through (d) because Klarna's headquarters and principal place of business is located in this District, Klarna resides in this District, and substantial parts of the events or omissions giving rise to the claims occurred in or emanated from this District, including, without limitation, decisions made by Klarna's governance and management personnel.

## III. PARTIES

### A. Plaintiffs

11. Ahntourage Media LLC ("Ahntourage") is an S corporation organized and existing under the laws of Pennsylvania, with its principal place of business in Trevose, Pennsylvania.

12. Daniel Perez is an individual who is a resident of Florida.

13. James Gatlin LLC ("James Gatlin") is a limited liability company organized and existing under the laws of Texas, with its principal place of business in San Antonio, Texas.

14. Dan Becker LLC ("Dan Becker") is a limited liability company organized and existing under the laws of Wisconsin, with its principal place of business in Wisconsin.

**B. Defendant**

15. Klarna Inc. is a Delaware corporation that is headquartered within this judicial district, specifically at 800 N. High Street, Suite 400, Columbus in Franklin County, Ohio.

## IV. RELEVANT FACTS

### A. The Affiliate Marketing Industry

#### 1. The Rise of Affiliate Marketing and the Role of Affiliate Marketers

16. With the rise of online commerce and social media and the growing popularity of creators on platforms like YouTube, Instagram, and TikTok, Merchants are increasingly partnering with and relying on Affiliate Marketers to promote and market their products to consumers.

17. Merchants such as Walmart, Target, and Staples, and thousands of others, partner with Affiliate Marketers — either directly or through third-party affiliate networks — to advertise their products and generate leads in exchange for Affiliate Commissions. Affiliate Marketers earn commissions when their marketing efforts result in a sale.

18. Affiliate marketing is a multi-billion-dollar industry that is expanding rapidly and has become a significant driver of e-commerce revenue. In 2023, affiliate marketing had an estimated market size of $27.8 billion, which has grown to an estimated $37.3 billion in 2025 and is expected to grow to an estimated $48.0 billion by 2027.[1]

[1] Shubham Singh, *115 Affiliate Marketing Statistics (2025) – Market Size & Growth*, DemandSage (Feb. 18, 2025), https://www.demandsage.com/affiliate-marketing-statistics/.

19. The affiliate marketing industry is profitable because it is an effective way to market products and services to consumers.

20. Affiliate Marketers play a critical role in this industry because they garner the trust of their audience, recommend and promote Merchants' products and services, and help consumers purchase a specific product or service from a specific Merchant utilizing an affiliate link. Merchants also rely on Affiliate Marketers to reach desired audiences, drive new customers, and educate consumers about their products.

21. In a 2021 survey conducted by Nielsen, 71% of consumers said that they "trust advertising, opinions and product placements" from Affiliate Marketers, far more than said they trust other forms of online marketing such as banner ads, ads on social media networks, ads served on search engine results, ads on mobile devices, and online video ads.[2]

22. According to 2024 consumer survey conducted by GRIN, 74% of consumers have purchased a product because a social media influencer recommended it.[3]

23. As of 2024, affiliate marketing was "responsible for driving 16% of eCommerce sales in Canada and the US."[4]

**2. The Affiliate Marketing Process**

---

[2] *Getting closer: Influencers help brands build more personal consumer connections*, Nielsen (May 2022), https://www.nielsen.com/insights/2022/getting-closer-influencers-help-brands-build-more-personal-consumer-connections/.

[3] Press Release, GRIN Technologies, Inc., U.S. Shoppers Are Under the Influence: 74% of Consumers Have Purchased a Product Because an Influencer Recommended It (Mar. 20, 2024, 8:00 AM), https://www.businesswire.com/news/home/20240320786326/en/U.S.-Shoppers-Are-Under-the-Influence-74-ofConsumers-Have-Purchased-a-Product-Because-an-Influencer-Recommended-It.

[4] Emman Zahid, *21 Affiliate Marketing Statistics: Proven Data to Boost Earnings*, TrustPulse (Jan. 7, 2024), https://trustpulse.com/2024/01/07/affiliate-marketing-statistics/.

24. The affiliate marketing ecosystem involves three primary players — Merchants, consumers, and Affiliate Marketers — each of whom has a specific role. Merchants create and sell or resell products and services online to consumers. Consumers purchase products and services from Merchants. And Affiliate Marketers connect consumers and Merchants through Affiliate Marketers' marketing and promotional efforts.

25. Affiliate marketing generally proceeds through the following five steps.

26. ***First***, an Affiliate Marketer partners with a Merchant to promote the Merchant's products and services. This partnership is often facilitated by an "affiliate network," which is a third-party platform that connects Affiliate Marketers with Merchants. Affiliate Marketers can sign up for an affiliate network to increase the number of Merchants they partner with, when compared to signing up with each Merchant individually. (The relationship may also be run directly by the Merchant, such as the Amazon Associates program.)

27. ***Second***, after the Affiliate Marketer and Merchant agree to work together (either directly or through a third-party affiliate network), the Merchant provides the Affiliate Marketer with an "affiliate link." An affiliate link is a URL or hyperlink that directs a consumer to a Merchant's website, where the consumer can then purchase the product or service that the Affiliate Marketer is promoting. This affiliate link contains an alphanumeric identifier — an "Affiliate ID" — that is unique to the Affiliate Marketer. The Affiliate ID is used to determine which Affiliate Marketer referred the consumer to the Merchant's site.

28. ***Third***, the Affiliate Marketer promotes the Merchant's product. This generally involves creating "content" discussing or marketing the product or service — such as articles, blog posts, videos (including reels, shorts, and livestreams), images, and social media posts — and distributing it to online audiences on their own websites or on platforms such as YouTube,

Facebook, Instagram, TikTok, Twitch, and X (formerly Twitter). The Affiliate Marketer typically includes an affiliate link containing their Affiliate ID alongside the content promoting the Merchant's product.

29. ***Fourth***, a consumer viewing the Affiliate Marketer's content clicks on the affiliate link (or pastes it into their browser's search bar) and is redirected to the page on the Merchant's website containing the promoted product. At this moment, the Merchant stores that Affiliate Marketer's Affiliate ID, typically in the website's cookie storage on the consumer's web browser. If the consumer leaves the Merchant's website without completing a purchase, views content published by a different Affiliate Marketer, and then uses that Affiliate Marketer's link to access the Merchant's website, the Affiliate ID for the second Affiliate Marketer will typically be the one stored in the website's cookie storage.

30. ***Fifth,*** as detailed below, when a consumer purchases the product on the Merchant's website, the Merchant uses the Affiliate ID stored in the cookie to assign credit for the sale to the Affiliate Marketer associated with that Affiliate ID and pay them the Affiliate Commission. There are various methods used to determine which Affiliate Marketer should be awarded credit for an online sale. The primary method used in the industry is "last click attribution," whereby the Affiliate Marketer associated with the last affiliate link clicked by the consumer prior to purchase gets credit for the sale. Affiliate Marketers and Merchants know and understand that last click attribution is the primary attribution method used in the affiliate marketing industry.

31. Thus, after the above five steps are taken, the Merchant has sold one of its products or services, the consumer has obtained the product or service, and the Affiliate Marketer has earned an Affiliate Commission for their work connecting the Merchant and consumer.

### B. How Affiliate Links Work and How Merchants Award Commissions.

#### 1. Merchants Rely on Affiliate IDs to Attribute Credit for Purchases.

32. Participants in the Affiliate Marketing ecosystem use digital tracking identifiers, such as the Affiliate ID described above, to determine whether an Affiliate Marketer is entitled to an Affiliate Commission.

33. Specifically, Merchants track Affiliate IDs using cookies, URL parameters (the part of the URL following a question mark that contains additional information about a click), tracking tags, or server-side functions to ascertain whether a consumer used an affiliate link to arrive on their web page. Using those tracking mechanisms, Merchants can attribute credit for the purchase to the Affiliate Marketer who referred the consumer to the product.

34. Each Affiliate Marketer's affiliate link contains their unique Affiliate ID in the URL parameter. Merchants rely on the Affiliate ID to credit a particular Affiliate Marketer with Affiliate Commissions for sales of the Merchants' products that result from the Affiliate Marketer's promotion efforts.

35. While affiliate links may take various forms, the URL for those links generally contain the following components: domain, path/page, and Affiliate ID.[5]




[5] Dibakar Ghosh, *What Are Affiliate Links and How Do They Work?*, AuthorityHacker (Aug. 12, 2024) https://www.authorityhacker.com/what-are-affiliate-links/.

36. When a consumer clicks on an affiliate link to navigate to a Merchant's website, the Merchant's website reads the URL parameters and creates a small text file called a "cookie," which is then stored on the consumer's device or web browser. The cookie contains information about the Affiliate Marketer whose affiliate link the consumer clicked on; for example, the unique Affiliate ID associated with that Affiliate Marketer. The Affiliate ID stored within the website's cookie then remains until the cookie expires or is replaced by a different Affiliate ID. When the consumer subsequently makes a purchase from the website, the Affiliate ID is read from the cookie and is used to assign the Affiliate Commission for the purchased product or service to the Affiliate Marketer responsible for the sale.

37. Cookies associated with affiliate links have a set lifespan, which can last from 24 hours to 90 days depending on the Merchant. During that time, cookies store the last Affiliate ID clicked for the various Merchant websites. This setup is designed to account for the scenario where a consumer uses an affiliate link to navigate to a Merchant's product and closes out of the webpage without purchasing the product, but later returns to the Merchant's webpage and purchases the product. So long as the consumer purchases the product on the Merchant's website within the lifespan of the cookie, the most recent Affiliate Marketer whose link the consumer clicked on to navigate to the Merchant's product will get credit for the sale.

### 2. The Affiliate Marketing Industry Uses "Last Click Attribution" to Attribute Credit for Sales.

38. There are multiple attribution methods used in the industry to account for the possibility that a consumer may interact with an affiliate link for the same Merchant from multiple Affiliate Marketers.

39. Under any attribution method, the goal is for Merchants to fairly credit the Affiliate Marketer(s) who drove the sale of a product and pay them the corresponding Affiliate Commissions they have earned.

40. The most commonly used attribution method is "last click attribution," whereby the sale of the product and Affiliate Commission are credited to the Affiliate Marketer associated with the last affiliate link used by the consumer before the purchase. Last-click attribution has been described as "the industry standard, especially in digital marketing."[6]

41. Under this attribution method, all credit for a purchase goes to the Affiliate Marketer whose affiliate link was the final step in a consumer's journey to the Merchant's page where they subsequently completed a purchase.

42. Critically, "last click" in this context does not refer to the consumer's literal last click of the mouse in the process of making a purchase—as the last physical device click is, of course, on a button that completes the purchase. Rather, in the industry, a "click" means "navigating from one page to another by activating a hyperlink."[7] Thus, in the affiliate marketing context, a "click" refers to a consumer's interaction with a link — here, an affiliate link — that takes the consumer to the Merchant's website. A "click" also occurs when a consumer copies

---

[6] *First Click v. Last Click Attribution*, Hike, https://www.hikeseo.co/learn/reporting/first-click-vs-last-click-attribution (last visited June 13, 2025). *See also Last-Click Attribution Model in Affiliate Marketing*, Affiliboost, https://affiliboost.com/last-click-attribution-model-in-affiliate-marketing/ ("The Last-Click attribution model has become a cornerstone of affiliate marketing for years.") (last visited June 13, 2025).

[7] *Digital Attribution Primer 2.0*, Interactive Advertising Bureau, 3 (Aug. 2016), https://iab.com/wp-content/uploads/2016/10/Digital-Attribution-Primer-2-0-FINAL.pdf ("A click is the measurement of navigating from one page to another by activating a hyperlink. Clicks may be broken down into ad clicks, search clicks, affiliate clicks, and possibly other sub-categories.").

and pastes a hyperlink into their URL bar, further demonstrating that "last click" does not refer simply to clicking the mouse.

43. "Last click" does not include any actions that a consumer may take once they have arrived at the Merchant's website—such as navigating the site, comparing items, entering one's credit card information, address, delivery instructions, and other product specifications such as size/style—after clicking the affiliate link.

44. Klarna understood that Affiliate Marketers who engage in affiliate marketing programs are entitled to Affiliate Commissions for driving traffic to Merchants and that "last click attribution" is widely used in the affiliate marketing industry, at least because Klarna operates its own affiliate network, named the Klarna Creator Network.[8] Klarna itself markets its own creator network as a reason for Merchants to partner with it.[9] Moreover, the applicable terms and conditions for the Klarna Creator Network provide that Affiliate Marketers who participate in Klarna's creator network "earn money by driving traffic to Retailers with Affiliate Links and/or other fees."[10]

45. Plaintiffs and Class members have entered into contractual agreements with Merchants with whom Klarna also partners that are consistent with the "last-click attribution" model. Pursuant to these agreements, Plaintiffs and Class members are entitled to Affiliate Commissions when a consumer's final external click before entering a merchant's website and making a qualifying purchase was a click on the Affiliate Marketer's affiliate link.

---

[8] *Klarna Creator Network,* Klarna, https://www.klarna.com/international/enterprise/marketing-solutions/creator-platform/ (last visited June 13, 2025).

[9] *Id.*

[10] *Publisher Terms*, Klarna (Jan. 19, 2024), https://creator.klarna.com/about/publisher-terms.

46. For instance, Plaintiff Ahntourage's and Class members' agreements with Klarna partner Staples states that "[s]ales generated through the Affiliate link entitle the Affiliate to earn a cash commission" and that Staples "will fund payment for all commissions due to [the Affiliate]."

47. Plaintiff Perez's and Class members' agreements with Klarna partner Walmart similarly specify that they will earn Affiliate Commissions "on products that are actually purchased by a customer within the relevant cookie window after the customer has initially entered [the Walmart] Site as long as the customer re-enters [the] Site directly during that time and not through another affiliate link." These agreements also expressly prohibit Klarna's cookie-stuffing scheme. Specifically, the agreements explain that the "use [of] any type of method, software, automated script, or technology which attempts to intercept or redirect traffic or Commissions to or from any website, or otherwise artificially increase Commissions" is strictly prohibited. The agreements further advise directly that an Affiliate Marketer may not "employ, use, or receive any direct or indirect benefit from, any 'cookie stuffing' methods (e.g., use of 'cookie stuffing' to cause the Platform's tracking systems to conclude that a user has clicked through a Qualifying Link — and to pay Commissions accordingly - even if the user has not actually clicked through any such link)."

48. Plaintiff Perez's and Class members' agreements with Klarna partner Target similarly state that they are entitled to commissions "on sales of Qualifying Products or Qualifying Actions" if the consumer "use[s] a browser that has its cookies setting enabled" and "follow[s] a Qualifying Link." A "Qualifying Link" is defined as "any type of banner or text link provided by Target to be displayed, distributed[,] or played on your site or Affiliate Materials and can be tracked through Target's Target Vendor." Like Walmart, Target also expressly

prohibits Klarna's conduct. Specifically, Target's agreements with Class members explain that "[a] site or Affiliate Materials may be found unsuitable if they . . . [c]ontain software or use technology that attempts to intercept, divert or redirect Internet traffic to or from any other website, or that potentially enables the diversion of affiliate commissions from another website" and that an Affiliate Marketer may not "[e]ngage in cookie stuffing, forced clicks, or the use of popups/popunders or false or misleading links on your site or Affiliate Materials."

49. Plaintiff Ahntourage's, Plaintiff James Gatlin's, and Class members' agreements with Klarna partner FlexiSpot state that they are entitled to commissions "[e]ach time a user clicks through the [Affiliate] Link posted on the Affiliate Site and completes the sale of the product or service and we determine it is a Qualified Purchase." Like Walmart and Target, FlexiSpot also expressly prohibits Klarna's conduct. Specifically, FlexiSpot's agreements with Class members provide that Affiliate Marketers "agree not to use cookie 'stuffing,' or other techniques which may incorporate a tracking code without specific knowledge of the online user."

50. Plaintiff Dan Becker's and Class members' agreements with Klarna partner REI provide that they are entitled to commissions for "Qualifying Sales," which are defined as "the first sale of one or more Products in a transaction that results from the customer following an REI Link from an [Affiliate's] Site to an REI Site, where the sale is made during the time period set forth in the Program Materials." REI expressly prohibits Klarna's conduct. Specifically, REI's agreements with Class members state that Affiliate Marketers "shall not engage in . . . cloaking, hiding, spoofing, or otherwise obscuring the URL of your Approved Site containing REI Links (including by use of a redirecting page) such that we cannot reasonably determine the site or application from which a customer clicks an REI Link, or otherwise manipulating cookies in

order to gain Referral Fees, including by employing so-called 'cookie stuffing,' 'cookie spoofing' or similar methods."

51. Thus, both under the prevailing last-click attribution model and Affiliate Marketers' express agreements with Merchants, Affiliate Marketers are entitled to Affiliate Commissions when their affiliate link was a consumer's final click external to the merchant's webpage—a click that directed the consumer to the Merchant's webpage on which the consumer completed a qualifying purchase.

## C. The Klarna Brower Extension

### 1. Background

52. In late 2021, Klarna acquired, for an undisclosed amount, the online startup Piggy, which built and operated a popular browser extension that provided users with automatic coupon codes or cashback offers when completing online shopping purchases. At the time Klarna purchased Piggy, the browser extension had more than one million users.

53. On December 9, 2021, following its purchase of Piggy, Klarna announced the launch of the Klarna Browser Extension, which had been in beta testing with over 100,000 consumers.[11]

54. In the announcement, Klarna touted the promise of Klarna Browser Extension's automatic couponing and cashback features, which it claimed would save consumers' time and money by instantaneously scraping the web for coupon codes and discounts, since "44% of online orders are placed on the desktop."[12] Klarna's announcement also promoted consumers' ability to

---

[11] Press Release, Klarna, Klarna Launches Browser Extension Allowing Consumers to Pay Later Across All Online Stores (Dec. 9, 2021), https://www.klarna.com/international/press/klarna-launches-browser-extension-allowing-consumers-to-pay-later-across-all-online-stores/.

[12] *Id.*

create "one time cards" on the Klarna Browser Extension, which would allow consumers to utilize Klarna's "Pay Later" services with all online retailers.[13]

55. A browser extension—sometimes called a "plug-in" or "add-on"—is a piece of software that runs within the consumer's web browser and can modify the functionality of all websites that the browser visits. Often, they are used to add functionality to websites or remove unwanted website functions, like pop-up ads or usage trackers.[14] Browser extensions are often easy to download and install onto a web browser. Consumers may download a browser extension for a variety of purposes: to save passwords, block advertisements, check spelling, or, as in the case of the Klarna Browser Extension, purportedly search for coupons or cashback offers when a consumer is shopping on an online retailer's website.

56. At launch, the Klarna Browser Extension was available to desktop and laptop users on the Google Chrome and Microsoft Edge browsers.

57. Today, according to Google Chrome's web store, where users download Chrome browser extensions, the Klarna Browser Extension has at least 1 million users on Google Chrome alone.[15]

58. On its website, Klarna touts that its services have 100 million active consumers and handle 2.9 million transactions per day.[16]

---

[13] *Id.*

[14] Ivy Wigmore, Browser Extension, TechTarget (Feb. 13, 2018), https://www.techtarget.com/whatis/definition/browser-extension.

[15] *Klarna | Shop now, Pay Later*, Chrome Web Store, https://chromewebstore.google.com/detail/klarna-shop-now-pay-later/hfapbcheiepjppjbnkphkmegjlipojba (last visited June 13, 2025).

[16] *About Us*, Klarna, https://www.klarna.com/us/about-us/ (last visited June 13, 2025).

### 2. Klarna Uses the Klarna Browser Extension to Steal Commissions from Affiliate Marketers

59. When a consumer clicks an Affiliate Marketer's affiliate link associated with a particular Merchant and then completes a purchase on the Merchant's website, the "last click" for purposes of "last-click attribution" will be credited to the last Affiliate Marketer who drove the consumer to the Merchant website where the purchase was made.

60. The Klarna Browser Extension injects itself into this process by surreptitiously fabricating a "click"—i.e., a referral to a Merchant website—where none actually takes place, when a consumer interacts with the browser extension.

61. The Klarna Browser Extension seeks consumer engagement by displaying various pop-ups to the consumer throughout the purchase process, including at checkout, that (1) notify the consumer of supposedly applicable coupons or (2) encourage the consumer to activate "points" that can be exchanged for cashback. The Klarna Browser Extension also seeks consumer engagement by "lighting up" on websites where it purportedly offers coupons, cashback, or flexible payment options. A consumer can also click on the Klarna Browser Extension to check whether Klarna offers coupons or cashback on a particular Merchant's website.

62. As explained in further detail below, when a consumer engages with the Klarna Browser Extension, the browser extension injects a background tab in the consumer's browser to surreptitiously load the Merchant's website using Klarna's affiliate link.

63. The spoofed click enables Klarna to insert its own Affiliate ID, which signals to the Merchant that Klarna, rather than the Affiliate Marketer who referred the consumer to the product, should receive the Affiliate Commission. In reality, Klarna did nothing to refer the consumer to the Merchant's website and thus should not be awarded an Affiliate Commission.

64. Klarna's tactics are what is known in the industry as "cookie stuffing." Cookie stuffing is a deceptive practice that "involves placing tracking cookies onto a device without the user's knowledge or consent."[17]

65. One academic research paper described cookie stuffing as follows:

> [I]nstead of using the affiliate URL as a clickable link, a fraudulent affiliate may cause the browser to directly fetch her affiliate URL on a page controlled by her without any explicit clicks from the user, thereby tricking the affiliate program into returning a cookie that then identifies the fraudulent affiliate as the referrer for the user's transactions. As a result, not only does an affiliate program pay a non-advertising affiliate, but the fraudulent cookie overwrites any existing affiliate cookie that may have already been present, thereby potentially stealing the commission from a legitimate affiliate. Furthermore, cookie-stuffing fraud is typically completely opaque to an end user and goes against the advertising guidelines issued by the Federal Trade Commission for marketers, which require declaration of any financial relationship with advertisers.[18]

66. Cookie stuffing is generally prohibited by affiliate marketing programs, and an Affiliate Marketer who is found to have engaged in cookie stuffing may be banned from future participation in the affiliate marketing program. For example, as discussed above, Walmart expressly prohibits Affiliate Marketers who participate in its affiliate marketing program from "employ[ing], us[ing], or receiv[ing] any direct or indirect benefit from, any 'cookie stuffing' methods (e.g., use of 'cookie stuffing' to cause the Platform's tracking systems to conclude that a user has clicked through a Qualifying Link — and to pay Commissions accordingly — even if the user has not actually clicked through any such link)."[19] Klarna's own affiliate marketing

[17] *Cookie Stuffing*, NordVPN, https://nordvpn.com/cybersecurity/glossary/cookie-stuffing/ (last visited June 13, 2025).

[18] Neha Chachra, et al., Affiliate Crookies: Characterizing Affiliate Marketing Abuse, 1 (2015), https://www.sysnet.ucsd.edu/~voelker/pubs/crookies-imc15.pdf.

[19] *Terms & Conditions – Walmart Operating Agreement for Affiliate Network*, Walmart Affiliates, https://affiliates.walmart.com/terms (last visited June 13, 2025).

program similarly prohibits Affiliate Marketers from "engag[ing] in any activity to create fraudulent/forced clicks."[20]

67. Cookie stuffing can also give rise to criminal liability — several Affiliate Marketers have been charged and pled guilty to wire fraud based on their use of "cookie stuffing" schemes to obtain unearned Affiliate Commissions.[21]

**a. Clicking on an Affiliate Link for a Merchant Sets An Affiliate Cookie on the Consumer's Browser**

68. Plaintiff Ahntourage is an Affiliate Marketer who generates content, including videos on YouTube, related to home office technology. An example of one of Ahntourage Media's YouTube videos is shown below in Figure 1. The video is titled "I Tested Highly Rated Walking Pads. One is Clearly the Best," and available at the following link: https://www.youtube.com/watch?v=x8Wg36gzcqg.

[20] *Publisher Terms*, Klarna (Jan. 19, 2024), https://creator.klarna.com/about/publisher-terms.

[21] *See e.g.,* Press Release, U.S. Att'ys Off., S.D. Ala., "Cookie Stuffing" Internet Fraud Schemer Pleads Guilty (Aug. 20, 2014), https://www.justice.gov/usao-sdal/pr/cookie-stuffing-internet-fraud-schemer-pleads-guilty; Press Release, U.S. Att'ys Off., N.D. Cal., Laguna Niguel Man Receives Fifteen-Month Prison Term For Defrauding eBay (Aug. 4, 2014), https://www.justice.gov/usao-ndca/pr/laguna-niguel-man-receives-fifteen-month-prison-term-defrauding-ebay.




**Figure 1: A consumer views a video on Plaintiff Ahntourage's YouTube channel.**

69. As shown in Figure 2, the description of the video contains several of Plaintiff Ahntourage's affiliate links, including a link to a walking pad sold by FlexiSpot:




**Figure 2: The description of the video contains Plaintiff Ahntourage's affiliate links, including a link for FlexiSpot products.**

70. A consumer who clicks on the link can purchase the FlexiSpot walking pad at the following link: https://www.flexispot.com/auto-incline-walking-treadmill-wpm03?sscid=61k9_989zi&utm_source=ShareASale&utm_medium=Affiliate&utm_campaign=2647863&utm_term=2706400.

71. The portion of the link containing "utm_campaign" indicates that the referral Affiliate ID is "2647863," which is the Affiliate ID for Ahntourage Media.

72. As shown below in Figure 3, clicking that link takes a consumer to FlexiSpot's website, specifically the page on FlexiSpot's website for the product that Plaintiff Ahntourage is promoting:




**Figure 3: A consumer who clicks on Plaintiff Ahntourage's affiliate link for FlexiSpot will be redirected to the page on FlexiSpot's website for that product.**

73. When the consumer clicks the Plaintiff Ahntourage's affiliate link, FlexiSpot's web server reads the Affiliate ID parameter in the URL and stores it in a cookie. This Affiliate ID tells FlexiSpot which website sent the consumer to its site, and which affiliate link was used. The Affiliate ID is highlighted in the URL, and also reproduced here in Figure 4, where "2647863" is Plaintiff Ahntourage's Affiliate ID:




**Figure 4: Plaintiff Ahntourage's Affiliate ID is contained within URL of the page the consumer is accessing.**

74. At this point, a cookie with the Affiliate Marketer's Affiliate ID has been created and stored on the consumer's browser. Consumers can view the cookies and values stored on most browsers. For example, the following image from the Global Cookie Manager tool on the Google Chrome browser reflects that FlexiSpot stored Plaintiff Ahntourage's Affiliate ID (2647863) in the "_attentive_utm_param_campaign" cookie.




**Figure 5: The Global Cookie Manager reflects that Plaintiff Ahntourage's Affiliate ID ("2647863") is stored in the "_attentive_utm_param_campaign" cookie for FlexiSpot.**

75. If the consumer completes the transaction and this cookie is properly stored on the consumer's browser, then Plaintiff Ahntourage gets credit for the transaction and earns the Affiliate Commission. The process is relatively simple: a link is clicked, a cookie containing Plaintiff Ahntourage's Affiliate ID is placed on the consumer's browser, and when the transaction is completed, FlexiSpot reads the cookie with Plaintiff Ahntourage's Affiliate ID and awards an Affiliate Commission to Plaintiff Ahntourage.

76. Absent any outside interference, the final outcome is what the consumer, Affiliate Marketer, and Merchant contemplated: the consumer purchased a good or service through a Merchant website using an affiliate link designed to relay a portion of that purchase to the Affiliate Marketer.

77. If a consumer were to click Plaintiff Ahntourage's affiliate link but not complete the purchase for the product, and then, one week later, click another Affiliate Marketer's affiliate link for the same product, the later-in-time Affiliate Marketer's Affiliate ID would be stored as the value in the cookie and that "last clicked" Affiliate Marketer would get credit when the purchase was completed.

78. Klarna, however, surreptitiously injects itself in this process to take credit, and thus the Affiliate Commission, for the sale. It does so even though it did not drive the consumer to the Merchant website.

79. When a consumer downloads the Klarna Browser Extension, the installation process grants the browser extension a set of "permissions"; i.e., what the extension is allowed to do to the consumer's device. The Klarna Browser Extension implicitly promises the consumer that they will get access to discounts and flexible payment options in exchange for granting this broad set of permissions.

80. The permissions granted to the Klarna Browser Extension are extensive and far beyond what would be needed to deliver coupons, cashback, or flexible payment options to users. Due to a so-called "Wildcard" permission, denoted by a set of symbols "*://*/*", the Klarna Browser Extension is able to access all domains—i.e., websites—that a consumer accesses, along with all "subdomains" on those sites. This means that the Klarna Browser Extension, unbeknownst to the consumer, is able to operate in the background—accessing pages or, critically, creating pages—even where a consumer does not navigate to them. Klarna uses the Klarna Browser Extension code to do at least the following:

- **Cookies**: query and modify cookies, and be notified when they change;
- **webRequest**: observe and analyze web traffic, and block or modify incoming web traffic (i.e., signals sent from other computers over the Internet to the consumer's computer);
- **scripting**: the Klarna Browser Extension can execute script, meaning it can run a sequence of instructions, or software code, or perform specific tasks (i.e., follow the steps provided for it in a piece of computer code);
- **Storage**: store, retrieve, and track changes to consumer data; and
- **Alarms**: schedule code to run periodically or at a specified time

81. Developer tools on a web browser can show the activities a browser extension engages in. Figure 6 shows some of the analytics traffic that is being requested in the background by the Klarna Browser Extension and sent to Klarna's server at https://app.klarna.com.




**Figure 6: Developer tools show that analytics traffic is sent by the Klarna Browser Extension to Klarna's server at https://app.klarna.com.**

82. In the context of a web developer tool like this one, "payload" means the data sent by the browser. Here, as below shown in Figure 7, one of the "payloads" — i.e., sets of data the extension is seeking and receiving — is the "URL" parameter, which reflects the complete URL of the webpage that the consumer is currently accessing:




**Figure 7: The payload of the "url-metadata" event contains the full URL of the current page along with a "browserSessionID" and a "merchantSessionID".**

83. The URL contains Plaintiff Ahntourage's Affiliate ID and shows that the Klarna Browser Extension is tracking and logging the consumer's web traffic, including the URL, which contains the Affiliate ID and other indicators — such as the "UTM_medium" parameter — that reflect whether the consumer was directed to the Merchant's webpage by an affiliate link.

84. As shown in Figure 7, above, the URL information is logged alongside a "browserSessionId" and a "merchantSessionId", which makes the specific consumer's web traffic identifiable to Klarna.

85. The page URL contains Ahntourage Media's Affiliate ID – "2647863" – and shows the Klarna Browser Extension tracking and logging the consumer's web traffic, including traffic that indicates whether an Affiliate ID is already applied, as it is here. In other words, the Klarna Browser Extension is tracking and logging consumer activities, including where on the internet the consumer is navigating their web browser. Thus, the Klarna Browser Extension creates a record each time it replaces an Affiliate Marketer's Affiliate ID with Klarna's own Affiliate ID.

**b. When A Consumer Interacts with the Klarna Browser Extension, Klarna Overwrites Existing Affiliate IDs with Klarna's Own Affiliate ID.**

86. Continuing with the above example, a consumer who has installed the Klarna Browser Extension and who has clicked Plaintiff Ahntourage's affiliate link for the FlexiSpot product described above will be redirected to the FlexiSpot website. If the consumer has the Klarna Browser Extension installed, as indicated in Figure 8 below, the Klarna Browser Extension will light up — indicating that it can be activated on that website and purportedly offer the consumer cashback or coupons — thereby enticing the consumer to click on it.




**Figure 8: The icon for the Klarna Browser Extension lights up when it can be activated on a Merchant's website.**

87. If the consumer clicks on the Klarna icon, the extension opens up and presents the consumer with the following pop-up, which invites the consumer to "Activate" points.




**Figure 9: If clicked, the Klarna Browser Extension opens up a pop-up, which invites a consumer to "Activate" points on the Merchant's website.**

88. The Klarna Browser Extension also entices consumers to activate the extension through automatic pop-ups like the one shown in Figure 10 below, which indicates that the Klarna is offering cashback "points" on the FlexiSpot website and invites the consumer to "Activate points":




**Figure 10: The Klarna Browser Extension generates an automatic pop-up that invites a customer to click and "Activate points" on the Merchant's website.**

89. If a consumer clicks on the "Activate" button shown in Figure 9 or the "Activate points" button shown in Figure 10, Klarna will purportedly activate rewards "points" that can be redeemed for cashback. In reality, when the consumer clicks on either button, the Klarna Browser Extension surreptitiously injects a new "background tab" in the browser to the right of all other tabs in the consumer's browser:




**Figure 11: When activated, the Klarna Browser Extension injects a new background tab in the consumer's browser.**

90. The "background tab" only appears for a few seconds, and then automatically disappears. As shown in Figure 12, the new background tab loads the generic homepage of the Merchant's website, before disappearing:




**Figure 12: The injected background tab loads the generic homepage of the FlexiSpot website and points to a URL containing Klarna's Affiliate ID.**

91. The new background tab points to the following URL — https://www.flexispot.com/?sscid=61k9_88trb&utm_source=ShareASale&utm_medium=Affiliate&utm_campaign=1162495&utm_term=943058 — which contains the Affiliate ID for Klarna ("1162495") in the "utm_campaign" parameter.

92. In this scenario, by automatically injecting the new tab in the background of the browser for a few seconds, the Klarna Browser Extension has inserted Klarna's own Affiliate ID into the URL and replaced the Affiliate ID of the original Affiliate Marketer. The opening of this tab also opens the FlexiSpot website, and so the FlexiSpot website reads the URL parameters and stores that parameter as the cookie value, replacing Plaintiff Ahntourage's Affiliate ID ("2647863") with Klarna's own Affiliate ID, "1162495".

93. After a few seconds, the "injected background tab" will disappear, while all previous tab(s) remain open. Thus, Klarna has surreptitiously replaced the previous Affiliate Marketer's Affiliate ID with its own Affiliate ID.

94. As shown in Figure 13 below, the Global Cookie Manager tool reveals that the cookie that previously contained Plaintiff Ahntourage's Affiliate ID has now been overwritten with Klarna's Affiliate ID:




**Figure 13: After the Klarna Browser Extension activates, FlexiSpot's "_attentive_utm_param_campaign" cookie now contains Klarna's Affiliate ID ("1162495").**

95. As shown below in Figures 14 and 15, the replacement of Plaintiff Ahntourage's Affiliate ID with Klarna's Affiliate ID is also tracked and collected by Klarna's analytics server. The "Request URL" in Figure 14 and the "URL parameter" in Figure 15 both reflect that the URL of the page now contains Klarna's Affiliate ID ("1162495"):




**Figure 14: Developer tools show some of the traffic sent by the Klarna Browser Extension to Klarna's server at [https://app.klarna.com](https://app.klarna.com) following the activation of the extension.**




**Figure 15: Following the activation of the extension, the URL parameter now contains Klarna's Affiliate ID.**

96. The Klarna Browser Extension uses the background tab to create the illusion that Klarna referred the consumer to FlexiSpot, since FlexiSpot reads the activity in the background tab as if the consumer had intentionally come back to the Merchant's website using an affiliate link associated with Klarna. In other words, the Merchant's website treats the created URL as a second-in-time referral and replaces the Affiliate ID of the Affiliate Marketer who generated the sale with Klarna's Affiliate ID on the consumer's browser.

97. The result is a "stuffing" of the affiliate cookie on the consumer's web browser.

98. In this scenario, Klarna obtains credit for the referral and ultimate purchase of the product from the Merchant even though it did not market the product or refer the consumer to the product.

99. The above-mentioned process works the same regardless of whether the Klarna Browser Extension is actually offering consumers any cashback rewards or coupons. Klarna engages in the same cookie-stuffing practice in other scenarios where the Klarna Browser Extension is activated; for example, when a consumer clicks on a Klarna pop-up that invites the consumer to "Activate coupons and points" or clicks on the button to "Try" coupons at checkout.

100. Klarna's creation of a background tab in the consumer's browser is a commercially unreasonable manipulation of tracking cookies for profit: Klarna causes a "browser to directly fetch" an "affiliate URL on a page controlled by [the extension] without any explicit clicks by the user."[22] In doing so, Klarna wrongfully overwrites the legitimate Affiliate Marketer's Affiliate ID in the consumer's cookie storage and replaces it with Klarna's own Affiliate ID.

101. Consumers of the Klarna Browser Extension do not expect the extension to replace or overwrite Affiliate Marketers' Affiliate IDs with Klarna's Affiliate ID when they activate it. This cookie-stuffing functionality is not disclosed to consumers in Klarna's Terms of Service or Privacy Policy, or in any information that is disclosed to consumers who install the extension in the ordinary course. Moreover, since February 2025, Klarna has included the following on its webpage marketing the Klarna Browser Extension: "Does Klarna steal affiliate commissions from influencers when you use coupons or points? No."[23]

---

[22] *See* Neha Chachra, et al., Affiliate Crookies: Characterizing Affiliate Marketing Abuse, 1 (2015), https://www.sysnet.ucsd.edu/~voelker/pubs/crookies-imc15.pdf.

[23] *Browser Extension,* Klarna, https://www.klarna.com/us/browser-extension/ (last visited June 13, 2025).

### 3. Klarna's Conduct is Traceable Through its Own Records and Statistical Analysis.

102. Klarna receives an Affiliate Commission every time it uses the Klarna Browser Extension to swap out a legitimate Affiliate ID with Klarna's own Affiliate ID. As discussed in detail above, the Klarna Browser Extension logs and transmits a record of activities to Klarna's servers as they occur. Klarna's financial and computer records thus provide records of the conduct alleged in this Complaint.

103. In addition to Klarna's records, statistical analysis provides evidence of the likelihood that Klarna will replace an Affiliate Marketer's Affiliate ID with its own. This analysis shows that it is a near statistical certainty that Klarna wrongfully claimed at least one Affiliate Commission from any Affiliate Marketers with at least 1,000 purchases for which they were eligible to receive an Affiliate Commission.

104. Plaintiffs conducted a statistical analysis using a "Monte Carlo" simulation, a way to model the probability of different outcomes given the risk of unknown variables.[24] The simulation functions like a series of weighted coin flips. Plaintiffs conducted a Monte Carlo simulation to estimate the probability that the Klarna Browser Extension would overwrite an existing Affiliate ID.

105. Plaintiffs ran Monte Carlo simulations for sets of 5,000 sales involving affiliate links, with different scenarios accounting for a variety of variables including the number of purchases for which an Affiliate Marketer was eligible to receive a commission, whether a purchaser was coming from a U.S. or non-U.S. location, the prevalence of different internet

[24] Will Kenton, *Monte Carlo Simulation: What It Is, How It Works, History, 4 Key Steps*, INVESTOPEDIA (June 27, 2024), https://www.investopedia.com/terms/m/montecarlosimulation.asp.

browsers (such as Chrome, Safari, Firefox, or Edge), and the prevalence of the Klarna Browser Extension. The simulation included a sensitivity analysis measuring the impact of the "swap probability"—the probability that the Klarna Browser Extension performed the Affiliate ID swap described above. Based on these variables, the simulation calculated the likelihood that an Affiliate Marketer with a given number of eligible affiliate purchases had at least one Affiliate Commission taken by Klarna as a result of the Klarna Browser Extension.

| Affiliate Purchases | Swap Probability | Affected Probability | Num Affected (Mean) | Num Affected (SD) |
|---|---|---|---|---|
| 1000 | 10.0% | 43.6% | 0.57 | 0.75 |
| 1000 | 20.0% | 68.8% | 1.16 | 1.08 |
| **1000** | **30.0%** | **82.1%** | **1.73** | **1.33** |
| 1000 | 40.0% | 90.1% | 2.29 | 1.53 |
| 1000 | 50.0% | 94.7% | 2.85 | 1.67 |
| 1000 | 60.0% | 97.4% | 3.43 | 1.84 |
| 1000 | 70.0% | 98.4% | 4.01 | 1.98 |
| 1000 | 80.0% | 99.1% | 4.57 | 2.16 |
| 1000 | 90.0% | 99.6% | 5.05 | 2.21 |
| 1000 | 100.0% | 99.7% | 5.66 | 2.35 |
| 2500 | 10.0% | 75.0% | 1.39 | 1.18 |
| 2500 | 20.0% | 93.8% | 2.81 | 1.68 |
| **2500** | **30.0%** | **98.6%** | **4.26** | **2.09** |
| 2500 | 40.0% | 99.7% | 5.71 | 2.40 |
| 2500 | 50.0% | 99.9% | 7.10 | 2.65 |
| 2500 | 60.0% | 100.0% | 8.50 | 2.92 |
| 2500 | 70.0% | 100.0% | 9.96 | 3.15 |
| 2500 | 80.0% | 100.0% | 11.43 | 3.37 |
| 2500 | 90.0% | 100.0% | 12.91 | 3.54 |
| 2500 | 100.0% | 100.0% | 14.25 | 3.80 |
| 5000 | 10.0% | 94.4% | 2.85 | 1.70 |
| 5000 | 20.0% | 99.7% | 5.72 | 2.37 |
| **5000** | **30.0%** | **100.0%** | **8.50** | **2.89** |
| 5000 | 40.0% | 100.0% | 11.40 | 3.33 |
| 5000 | 50.0% | 100.0% | 14.18 | 3.77 |
| 5000 | 60.0% | 100.0% | 17.09 | 4.17 |

| | | | | |
|---|---|---|---|---|
| 5000 | 70.0% | 100.0% | 19.92 | 4.47 |
| 5000 | 80.0% | 100.0% | 22.85 | 4.71 |
| 5000 | 90.0% | 100.0% | 25.68 | 5.07 |
| 5000 | 100.0% | 100.0% | 28.46 | 5.40 |

106. The results of the Monte Carlo analysis demonstrate that, even with the conservative assumption of a 30% probability that a swap occurs, for an Affiliate Marketer with 1,000 purchases on which they are eligible to receive an Affiliate Commission, there is an 82.1% chance that at least one of their Affiliate Commissions would be taken by Klarna. In other words, 4,105 times out of 5,000, at least one (and an average of 1.73) of their rightfully earned commissions would be taken by Klarna.

107. For an Affiliate Marketer with 2,500 purchases that are eligible to receive an Affiliate Commission and the conservative swap probability of 30%, there is a 98.6% chance that at least one of their Affiliate Commission would be taken by Klarna. Stated differently, 4,931 times out of 5,000, at least one (and an average of 4.26) of their commissions would be taken by Klarna.

108. Last, for an Affiliate Marketer with 5,000 purchases that are eligible to receive an Affiliate Commission and the same 30% swap probability, there is a 100% chance that at least one of their Affiliate Commissions would be taken by Klarna. That means that 5,000 times out 5,000, at least one (and an average of 8.5) of their commissions would be taken by Klarna. Put differently, in this scenario, it is a statistical certainty that at least one of the Affiliate Marketer's commissions will be taken by Klarna.

109. Every Plaintiff named in this Complaint had at least 1,000 eligible purchases.

### D. Klarna Knew It Was Using the Klarna Browser Extension to Misappropriate Affiliate Commissions from Plaintiffs and Other Affiliate Marketers.

110. Klarna knew that the Klarna Browser Extension is designed to monitor and contemporaneously log detailed information about a consumer's browsing activity, including the full-string URL of each web page visited by a consumer. From these URLs, Klarna knew when a consumer navigated to a specific Merchant's website using a specific Affiliate Marketer's affiliate link.

111. Klarna understood that the Klarna Browser Extension is designed to inject a background tab that redirects a consumer's browser to a purpose-built URL, which causes any existing Affiliate IDs to be overwritten with or displaced by Klarna's Affiliate IDs. Among other things, Klarna knew that when a consumer navigated to a Merchant's website using a specific Affiliate Marketer's affiliate link and the Klarna Browser Extension was activated, the Klarna Browser Extension would use hidden processes to overwrite or displace the Affiliate Marketer's Affiliate ID with Klarna's Affiliate ID, resulting in Klarna, rather than the Affiliate Marketer, being assigned credit for the sale and awarded any Affiliate Commission, or allowing Klarna to wrongly claim a portion of the Affiliate Commission that it did not earn.

### E. Klarna Has Harmed Plaintiffs

112. **Ahntourage Media** is an Affiliate Marketer who has reviewed "all things chairs" and home office technology on YouTube and other social media platforms since 2019.[25] Ahntourage Media has more than 93,000 subscribers to his YouTube channel.

[25] Ahntourage Media's social media handles include @Ahnestly (YouTube), @StayAhnest (Instagram), @StayAhnest (X), @StayAhnest (TikTok), and Ahnestly (Facebook).

113. Ahntourage Media has always relied on affiliate marketing links posted on his social media platforms to earn commissions for sales he generates and to help pay for the time and effort that Ahntourage Media puts into producing its content.

114. Ahntourage Media generated more than 1,500 transactions for which he received commissions and earned approximately $400,000 in revenue from affiliate marketing in 2024.

115. Ahntourage Media regularly partners with a number of Merchants that also partner with Klarna, including, but not limited to, Belkin, Eureka Ergonomic, Eufy, Flexispot, Govee, Grovemade, Hbada, OnePlus, Staples, Xgimi, and Zappos.

116. Ahntourage Media has been conducting affiliate marketing for Staples for five years and expects to continue partnering with Staples in the future.

117. Ahntourage Media has partnered with Belkin for approximately two and a half years, with Eureka Ergonomic for nearly one year, with Eufy for approximately two years, with FlexiSpot for three years, with Govee for two years, with Grovemade for approximately four years, with Hbada for approximately one year, with OnePlus for approximately two and a half years, with Xgimi for nearly four years, and with Zappos for three years. Ahntourage Media expects to continue partnering with each of these companies in the future.

118. When the Klarna Browser Extension overwrites and replaces Ahntourage Media's affiliate tracking code with Klarna's tracking code, Ahntourage Media is deprived of referral fees and sales commissions to which it was rightfully entitled. Ahntourage Media would have earned more in commissions but for Klarna's scheme to steal commissions via the Klarna Browser Extension. Through the extension, Klarna stole credit for sales that Ahntourage Media generated with its affiliate links.

119. **Daniel Perez** is an Affiliate Marketer with accounts on TikTok, Facebook, and YouTube. Mr. Perez has approximately 35,000 followers across those platforms. Mr. Perez posts his affiliate links on his website — https://www.fycdeals.com/ — as well as in a Facebook group and in a Telegram channel.

120. Mr. Perez relies on affiliate marketing links posted on his website and his social media platforms to earn commissions for sales he generates and to help pay for the time and effort that he puts into producing his content.

121. Over the past year, Mr. Perez generated more than 15,000 orders for which he received a commission and earned approximately $19,500 in revenue from affiliate marketing.

122. Mr. Perez regularly partners with a number of Merchants that also partner with Klarna, including, but not limited to, Amazon, Walmart, Target, and Woot.

123. Mr. Perez has partnered with Amazon since March of 2023, with Walmart since March of 2024, with Target since approximately April of 2024, and with Woot for approximately six months. He intends to continue partnering with each of these online merchants in the future.

124. When the Klarna Browser Extension overwrites and replaces Mr. Perez's affiliate tracking code with Klarna's tracking code, Mr. Perez is deprived of referral fees and sales commissions to which he was rightfully entitled. Mr. Perez would have earned more in commissions but for Klarna's scheme to steal commissions via the Klarna Browser Extension. Through the extension, Klarna stole credit for sales that Mr. Perez generated with his affiliate links.

125. **James Gatlin LLC** is an Affiliate Marketer who has created reviews, how-to guides, and other videos related to tools and repair supplies on YouTube since 2022. James Gatlin has more than 127,000 subscribers to his YouTube channels.[26]

126. James Gatlin relies on affiliate marketing links posted on its YouTube channel to earn commissions for sales it generates and to help pay for the time and effort that it puts into producing its content.

127. James Gatlin has generated more than 7,000 transactions that resulted in commissions and earned approximately $10,000 in revenue from affiliate marketing over the past two years.

128. James Gatlin regularly partners with a number of Merchants that also partner with Klarna, including, but not limited to, Amazon, FlexiSpot, and Wolf Box.

129. James Gatlin has been conducting affiliate marketing for Amazon for nearly two years and for FlexiSpot for approximately six months. James Gatlin expects to continue partnering with these companies in the future.

130. When the Klarna Browser Extension overwrites and replaces James Gatlin's affiliate tracking code with Klarna's tracking code, James Gatlin is deprived of referral fees and sales commissions to which it was rightfully entitled. James Gatlin would have earned more in commissions but for Klarna's scheme to steal commissions via the Klarna Browser Extension. Through the extension, Klarna stole credit for sales that James Gatlin generated with its affiliate links.

131. **Dan Becker LLC** is owned and operated by Dan Becker, an Affiliate Marketer who has had a platform on YouTube for over seven years.

---

[26] James Gatlin's YouTube channels are @james_gatlin and @Gatlin5000.

132. On YouTube alone, Dan Becker's channel "DanBecker" has over 450,000 subscribers. The channel features reviews for backpacking and hiking products. Dan Becker also has accounts on Instagram, TikTok, and Facebook, and publishes posts on his own website, www.danbeckeroutdoors.com.

133. Mr. Becker invests substantial time and effort into cultivating Dan Becker's follower base, searching for the best deals from Merchants, and promoting those deals online.

134. Dan Becker generates approximately 5,000 transactions that result in commissions and earns more than $100,000 in Affiliate Commissions per year through affiliate marketing.

135. Dan Becker regularly partners with or otherwise promotes the products of a number of popular Merchants through its affiliate links, including Merchants that also partner with Klarna. For example, Dan Becker has been part of the Avantlink affiliate network for approximately six years, the ShareASale and Shopify affiliate networks for approximately four years, and the Impact affiliate network for approximately two years, and has promoted products from Merchants such as Amazon, REI, and Backcountry.com through those networks. Additionally, Dan Becker has direct relationships with Merchants to promote their products, including Backcountry.com, with which it has partnered for approximately six years, and REI, with which it has partnered for approximately two years. Dan Becker intends to continue creating affiliate marketing content and partnering with these Merchants in the future.

136. When the Klarna Browser Extension overwrites and replaces Dan Becker's affiliate tracking code with Klarna's tracking code, Dan Becker is deprived of referral fees and sales commissions to which it was rightfully entitled. Dan Becker would have earned more in commissions but for Klarna's scheme to steal commissions via the Klarna Browser Extension.

Through the extension, Klarna stole credit for sales that Dan Becker generated with its affiliate links.

**F. Plaintiffs and Class Members Have Suffered Damages**

137. Plaintiff and Class Members were harmed by Klarna's conduct because the Klarna Browser Extension systematically misappropriates commission payments from their rightful owners—i.e., the individual who promoted and shared the affiliate link and generated the referral and ultimate sale of a product or service.

138. At various points in time, Klarna has offered coupons, cashback, or flexible payment options for many if not all of the merchants with whom Plaintiffs and Class Members have directly or indirectly partnered.

139. Many, if not all, of Plaintiffs' and Class Members' merchant partners use the last-click attribution model.

140. Plaintiffs were harmed by Klarna through the Klarna Browser Extension, which deprived them of referral fees and sales commissions that they earned as the generators of those referrals and sales.

141. The Klarna Browser Extension is activated during millions of online purchases each year. In the absence of the Klarna Browser Extension, Plaintiff and Class Members would have earned more money in the form of referral fees and sales commissions from their respective affiliate marketing links.

142. Plaintiffs continue to devote time and energy to content creation to generate Affiliate Commissions. Plaintiffs and Class Members face future harm in the form of stolen referral fees and sales commissions because the Klarna Browser Extension continues to misappropriate affiliate marketing commissions.

## V. CLASS ALLEGATIONS

143. Plaintiffs, on behalf of themselves and as a class action under the Federal Rules of Civil Procedure, Rule 23(a), (b)(1), (b)(2), (b)(3), and (c)(4), seeks damages and injunctive relief on behalf of the members of the following Class and constituent Subclasses (collectively, the "Class"):

> **Nationwide Class:** All persons in the United States who participated in an affiliate commission program with a United States eCommerce merchant and had commissions diverted to Klarna as a result of the Klarna browser extension.
>
> **Florida Subclass:** All Class members who are domiciled in Florida.
>
> **Pennsylvania Subclass:** All Class members who are domiciled in Pennsylvania.
>
> **Texas Subclass:** All Class members who are domiciled in Texas.
>
> **Wisconsin Subclass:** All Class members who are domiciled in Wisconsin.

144. Excluded from the Class and Subclasses are Defendant and its officers, directors, management, employees, subsidiaries, or affiliates. Also excluded are the district judge or magistrate judge to whom this case is assigned, as well as those judges' immediate family members.

145. **Numerosity:** Members of the Class are so numerous that joinder is impracticable. There are at least tens of thousands of members of the Class, geographically dispersed throughout the United States, such that joinder of all Class members is impracticable. There are at least thousands of members of the Subclasses, such that joinder of all Subclass members is likewise impracticable. The identities of members of the Class and Subclasses can be readily ascertained from business records maintained by Klarna and/or Merchants.

146. **Typicality:** Plaintiffs' claims are typical of the claims of the Class and Subclasses. The factual and legal bases of Defendant's liability are the same and resulted in injury to Plaintiff and all other members of the Class and Subclasses.

147. **Adequate representation:** Plaintiffs will represent and protect the interests of the Class both fairly and adequately. Plaintiffs have retained counsel competent and experienced in complex class-action litigation, and they have no interests that are antagonistic to those of the Class or Subclasses. Plaintiffs' interests do not conflict with the interests of Class members or Subclass members they seek to represent.

148. **Commonality and Predominance:** Questions of law or fact common to the members of the Class predominate over questions that may affect only individual Class or Subclass members because Defendant has acted on grounds generally applicable to the Class and Subclasses and because Class and Subclass members share a common injury. Thus, determining damages with respect to the Class as a whole is appropriate. The common applicability of the relevant facts to the claims of Plaintiff and the proposed Class are inherent in Defendant's wrongful conduct because the injuries incurred by Plaintiff and each member of the Class arose from the same conduct alleged herein.

149. There are common questions of law or fact specific to the Class that predominate over any questions affecting individual members and generate common answers, including:

a. Whether Defendant programmed and designed the Klarna Browser Extension in a manner that wrongfully credits it with sales referrals and commissions;

b. Whether the conduct described herein results in Klarna being awarded commission payments it did not rightfully earn;

c. Whether Defendant, through the actions allege in this complaint, interfered with the contracts and/or business relationships between Class Members and Merchants;

d. Whether Klarna has been unjustly enriched to the detriment of Plaintiff and Class Members;

e. Whether Defendant, through the actions alleged in this complaint, violated federal and state computer fraud and abuse laws;

f. Whether consumers and Class members have been damaged by Defendant's conduct; and

g. The nature and scope of appropriate injunctive relief.

150. **Superiority:** Class proceedings on these facts are superior to all other available methods for the fair and efficient adjudication of this controversy, given that joinder of all members is impracticable. Even if members of the Class could sustain individual litigation, that course would not be preferable to a class action because individual litigation would increase the delay and expense to the parties due to the complex factual and legal controversies present in this matter. Here, the class action device will present far fewer management difficulties, and it will

provide the benefit of a single adjudication, economies of scale, and comprehensive supervision by this Court. Further, uniformity of decisions will be ensured.

151. Class certification is also appropriate under Rules 23(b)(1), (b)(2), and/or (c)(4) because:

- The prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for Defendant;
- The prosecution of separate actions by individual Class Members would create a risk of adjudications that would, as a practical matter, be dispositive of the interests of other Class Members not parties to the adjudications, or would substantially impair or impede their ability to protect their interests;
- Defendant has acted or refused to act on grounds generally applicable to the Class, making injunctive and corresponding declaratory relief appropriate with respect to the Class as a whole; and
- The claims of Class Members are comprised of common issues whose resolution in a class trial would materially advance this litigation.

## TOLLING OF THE STATUTES OF LIMITATIONS

152. All applicable statute(s) of limitations have been tolled by Defendant's knowing and active concealment and denial of the facts alleged herein. Plaintiff and Class Members could not have reasonably discovered Defendant's practice of displacing and overwriting their Affiliate IDs, surreptitiously interfering with network transmissions, and allowing Klarna to take credit for Affiliate Commissions it did not earn.

153. Defendant was and is under a continuing duty to disclose to Plaintiffs and Class Members its practice of overwriting Affiliate IDs that identify Affiliate Marketers as the source of product referrals with Defendant's own Affiliate IDs in order to steal Affiliate Commissions that belong to Affiliate Marketers like Plaintiffs and Class members. As a result of the active concealment by Defendant, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

## VI. CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT
### 18 U.S.C. § 1030, ET SEQ.
### (ON BEHALF OF THE NATIONWIDE CLASS)

154. Plaintiffs incorporate the allegations in paragraphs 1-153 by reference as if fully set forth herein.

155. The Computer Fraud and Abuse Act (CFAA), 18 U.S.C. § 1030, makes it unlawful to "knowingly and with intent to defraud, access[] a protected computer without authorization, or exceed[] authorized access, and by means of such conduct further[] the intended fraud and obtain[] anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period."

156. 18 U.S.C. § 1030(g) provides a private right of action to "[a]ny person who suffers damage or loss by reason of a violation of this section[.]"

157. Through its browser extension, Klarna, knowingly and with intent to defraud, exceeded its authorized access to the browsers and computers of consumers that downloaded its browser extension, and through this conduct furthered its fraudulent scheme to wrongfully obtain the Affiliate Commissions of Plaintiffs and Class Members.

158. Klarna exceeded its authorized access to the computers of its consumers by accessing and altering or removing tracking codes that Klarna was not entitled to access and alter or remove. Klarna exceeded its authorized access by circumventing the technical restrictions in place that prevent it from directly accessing and overwriting tracking codes.

159. Consumers who downloaded the Klarna Browser Extension did not grant Klarna access that is necessary to be able to alter tracking codes because consumers themselves do not have that access and cannot overwrite tracking codes. From a browser's settings, an ordinary computer owner can see the fact that tracking codes are installed and can delete them. But an ordinary computer owner cannot access and overwrite the tracking codes. One would need specialized "developer tools" or other specialized software to access and overwrite tracking codes.

160. Lacking permission to access and alter the tracking codes, Klarna had to use the sophisticated technique described in this Complaint to circumvent the technical restrictions in place to allow the Klarna Browser Extension to artificially "trick" the consumer's browser and the Merchant's website into replacing the legitimate tracking codes of Plaintiffs and Class members with Klarna's illegitimate tracking codes.

161. When a consumer activates the Klarna Browser Extension, the Klarna Browser Extension surreptitiously injects a new browser tab in the background to avoid detection by the consumer. This injected tab redirects the consumer's browser to a purpose-built URL, which mimics a genuine click on an affiliate link, thus causing any existing Affiliate IDs associated with Affiliate Marketers to be overwritten with Klarna's Affiliate ID.

162. Klarna only receives the Affiliate Commission if it causes the affiliate marketing cookies to be replaced.

163. Consumers of Klarna Browser Extension do not expect the extension to operate in this manner or to alter this data, and the extension's cookie-stuffing functionality is not disclosed in the applicable terms of service or privacy policy, or in any information that is disclosed to consumers who install the extension in the ordinary course.

164. Klarna's code is executed in the browsers of computers that are used in or affect interstate commerce, and thus meet the definition of "protected computer" under the CFAA.

165. Klarna's substitution of its own Affiliate IDs for the Affiliate IDs of Plaintiffs and Class Members impairs the integrity and availability of the data contained in the original affiliate cookies designating Plaintiffs and Class Members as the proper party to receive an affiliate commission. The Klarna Browser Extension disrupted the commission attribution process, including communications between the merchant website and the merchant servers that attributed the sale to a Class Member instead of Klarna. As a result of this interruption of service, Plaintiffs and Class Members have lost substantial revenue from these valuable commissions that were improperly diverted to Klarna. Thus, Plaintiffs and Class Members have suffered damages and loss well in excess of $5,000 during a year as a result of Klarna's conduct.

166. Plaintiffs and the Class seek compensatory damages, injunctive relief, and all other legal or equitable relief available under the CFAA.

## SECOND CLAIM FOR RELIEF
## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIP
## (ON BEHALF OF THE NATIONWIDE CLASS UNDER OHIO LAW, AND IN THE ALTERNATIVE ON BEHALF OF THE STATE SUBCLASSES UNDER THEIR RESPECTIVE STATE'S LAWS)

167. Plaintiffs incorporate the allegations in paragraphs 1-153 by reference as if fully set forth herein.

168. Plaintiffs and Class Members are engaged in business relationships with Merchants by referring their followers to those merchants through affiliate links. These include, but are not limited to, business relationships with the Merchants listed above. In return, Merchants provide Plaintiffs and Class Members with referral fees or commissions. These relationships are ongoing, and based on the length and extent of these relationships, Plaintiffs and Class Members expect to continue earning commissions in exchange for referrals.

169. Klarna is aware of the referral and commission relationship between Plaintiffs and Class Members on the one hand and Merchants on the other hand.

170. Klarna knew that its conduct was certain or substantially certain to interfere with Plaintiffs' and Class Members' business relationships with Merchants. Klarna knew that the Klarna Browser Extension monitors and logs a consumer's browsing activity and understood that business relationships such as those between Affiliate Marketers like Plaintiffs and Class members and Merchants are standard in the affiliate marketing industry.

171. Through the use of the Klarna Browser Extension, Klarna misappropriates commission payments from Plaintiffs and Class Members who promoted and shared an affiliate link and generated the referral and ultimate sale of a Merchant's product or service. Specifically, Klarna displaces Affiliate IDs that identify online marketers as the source of the referral, substitutes its own Affiliate ID, and holds itself out as the referrer of the specific products and/or services even though the sale in question emanated from a content creator's affiliate marketing link. This conduct, which interferes with Plaintiffs' and Class Members' business relationships with Merchants, is wrongful, improper, and without justification, including because it independently violates the federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq.*,

and because it contravenes existing standards and norms in the affiliate marketing industry, which prohibit the use of cookie stuffing to divert affiliate commissions.

172. Klarna intended to usurp Affiliate Commissions from Plaintiffs and Class Members through the conduct alleged herein. Klarna either desired to divert Affiliate Commissions from Plaintiffs and Class members to themselves through the conduct alleged herein or knew that the diversion of Plaintiffs and Class members' Affiliate Commissions was certain or substantially certain to occur as a result of their conduct alleged herein. Specifically, Defendant understood that its Klarna Browser Extension injects a background tab that redirects a consumer's browser to a purpose-built URL, which causes any existing Affiliate IDs to be overwritten with Klarna's Affiliate ID. Defendant further understood that Merchants rely on affiliate marketing cookies to determine which party should be credited with a consumer's purchase and awarded with a commission payment. Defendant knew that when a consumer navigated to a specific Merchant's website using an online marketer's affiliate link and had the Klarna Browser Extension activated, the Klarna Browser Extension would replace the existing online marketer's Affiliate ID with Klarna's Affiliate ID, thus resulting in Defendant, rather than the Affiliate Marketer, being credited for the sale and awarded the commission payment.

173. Defendant's conduct interfered with Plaintiffs' and Class members' business relationships with Merchants by causing Merchants to pay Defendant, instead of Plaintiffs and Class Members, the monies that Plaintiffs and Class members rightfully earned as the true originators of sales arising from their promotion efforts and corresponding affiliate links.

174. Plaintiffs and Class Members were harmed by Klarna's conduct because the Klarna Browser Extension deprived Plaintiffs and Class Members of monies they rightfully earned as the true originators of sales arising from their affiliate marketing links.

175. Klarna's conduct was a substantial factor in causing harm to Plaintiffs and Class Members in that, among other things, they suffered economic injury by being deprived of commissions they should have earned from referrals through their affiliate links, pursuant to their business relationships with Merchants.

176. As a result of the above conduct, Klarna is liable to Plaintiffs and Class Members for damages in an amount to be determined at trial.

## THIRD CLAIM FOR RELIEF
## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
## (ON BEHALF OF THE NATIONWIDE CLASS UNDER OHIO LAW, AND IN THE ALTERNATIVE ON BEHALF OF THE STATE SUBCLASSES UNDER THEIR RESPECTIVE STATE'S LAWS)

177. Plaintiffs incorporate the allegations in paragraphs 1-153 by reference as if fully set forth herein.

178. Plaintiffs and Class Members are engaged in ongoing, valid contractual relationships with Merchants to promote products and services to consumers in exchange for Affiliate Commissions. These include, but are not limited to, contractual relationships with Merchants listed above. Under the terms of these contracts, Plaintiffs and Class Members promote Merchants' products and services and provide affiliate links to refer consumers to products and services sold or offered by the Merchants. In return, Merchants provide Plaintiffs and Class Members with a commission payment if a consumer completes a transaction on the Merchant's website after navigating to the Merchant's website through an affiliate link provided by Plaintiffs and Class Members.

179. Klarna knew or reasonably should have known of the contractual relationships between Merchants on the one hand and Plaintiffs and Class Members on the other, under which Plaintiffs and Class Members receive commissions from Merchants through affiliate links,

because the Klarna Browser Extension monitors and logs a consumer's browsing activity. Klarna further understood that contracts between Affiliate Marketers like Plaintiffs and Class members and Merchants for Affiliate Commissions are standard in the affiliate marketing industry. Defendant knew that the Klarna Browser Extension is designed to monitor and contemporaneously log detailed information about a consumer's browsing activity, including the full-string URL of each web page visited by a consumer. From these URLs, Defendant knew when a consumer navigated to a specific Merchant's website using a specific Affiliate Marketer's affiliate link and thus knew of the existence of a commission-based economic relationship between the specific Merchant and the specific Affiliate Marketer.

180. Through use of the Klarna Browser Extension, Defendant diverts Affiliate Commission payments from Plaintiffs and Class Members who promoted and shared affiliate links and generated referrals and sales of a Merchant's product or service. Defendant, via the Klarna Browser Extension, overwrites affiliate tracking cookies that identify Affiliate Marketers like Plaintiffs and Class Members as the source of the referral with Defendant's own affiliate tracking cookies and falsely holds itself out as the referrer of the specific products and/or services, even though the sale in question emanated from an Affiliate Marketer's affiliate link. This conduct, which interferes with Plaintiffs' and Class Members' contractual relationships with Merchants, is wrongful, improper, and without justification, including because it independently violates the federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq.*, and because it contravenes existing standards and norms in the affiliate marketing industry, which prohibit the use of cookie stuffing and similar mechanisms to divert affiliate commissions.

181. Defendant knew that a breach or disruption of Plaintiffs and Class Members' contracts with Merchants was certain or substantially certain to occur as a result of its conduct

alleged herein. Specifically, Defendant understood that their Klarna Browser Extension injects a background tab that redirects a consumer's browser to a purpose-built URL, which causes any existing Affiliate IDs to be overwritten with Klarna's Affiliate ID. Defendant further understood that Merchants rely on affiliate marketing cookies to determine which party should be credited with a consumer's purchase and awarded with a commission payment. Defendant knew that when a consumer navigated to a specific Merchant's website using an online marketer's affiliate link and had the Klarna Browser Extension activated, the Klarna Browser Extension would replace the existing online marketer's Affiliate ID with Defendant's Affiliate ID. Defendant further knew that replacing existing Affiliate IDs with Defendant's Affiliate ID would result in Merchants breaching their agreements with Plaintiffs and Class members by paying Defendant, instead of Plaintiffs and Class members, the monies that Plaintiffs and Class members rightfully earned as the true originators of sales arising from their affiliate links.

182. Defendant's conduct caused Merchants to breach their agreements with Plaintiffs and Class Members by paying Defendant, instead of Plaintiffs and Class members, the monies that Plaintiffs and Class Members rightfully earned as the true originators of sales arising from their affiliate links.

183. As a direct and proximate result of Defendant's interference with Plaintiffs' and Class members' contracts with Merchants, Plaintiffs and Class Members suffered harm and economic injury by being deprived of Affiliate Commissions they should have rightfully received pursuant to their contracts with Merchants for providing referrals through their affiliate links. As a result of the above conduct, Defendant is liable to Plaintiffs and Class Members for damages in an amount to be determined at trial.

**FOURTH CLAIM FOR RELIEF**
**UNJUST ENRICHMENT**
**(ON BEHALF OF THE NATIONWIDE CLASS UNDER OHIO LAW, AND IN THE ALTERNATIVE ON BEHALF OF THE STATE SUBCLASSES UNDER THEIR RESPECTIVE STATE'S LAWS)**

184. Plaintiffs incorporate the allegations in paragraphs 1-153 by reference as if fully set forth herein.

185. In the alternative to those claims seeking damages, Plaintiffs and Class members allege that there is no adequate remedy at law to address Defendant's conduct.

186. Plaintiffs and Class Members have an interest, both equitable and legal, in the referral fees and commission payments of which they were wrongfully deprived. These payments were rightfully earned by Plaintiffs and Class Members, not Klarna.

187. Plaintiffs and Class Members conferred a benefit on Klarna, because Plaintiffs and Class Members unwittingly drove consumers to Klarna when Plaintiffs and Class Member sent those consumers to Merchants' webpages, through their affiliate links and marketing efforts, where they made purchases resulting in Klarna's receipt of referral fees and commission payments.

188. Klarna benefitted from the referral fees and commission payments that were credited to it as a function of the Klarna Browser Extension wrongfully claiming credit for commissions via last-click attribution.

189. Klarna understood that it so benefitted, and it also understood and appreciated that the Klarna Browser Extension would cause the harm described herein.

190. But for Klarna's unjust and improper use of the Klarna Browser Extension, it would not have been credited and awarded commission on sales that emanated from Plaintiffs' and Class Members' respective affiliate marketing links.

191. As a result of Klarna's wrongful conduct as alleged in this Complaint, it has been unjustly enriched at the expense of, and to the detriment of, Plaintiffs and Class Members.

192. As a result of Klarna's wrongful conduct as alleged in this Complaint, it has received monies in the form of referral fees and commission payments that rightfully belong to Plaintiffs and Class Members.

193. Klarna should have reasonably expected to repay those referral fees and commission payments to Plaintiffs and Class Members, because Klarna knows that creators are entitled to commissions for driving traffic to merchants. Indeed, Klarna itself markets its own creator network as a reason for merchants to partner with it. Klarna pays creators who market on its behalf.

194. Klarna continues to benefit and profit from Plaintiffs and Class members directing prospective consumers to Merchants' websites through their affiliate links and marketing efforts and driving them to make purchases that result in Klarna's receipt of commission payments, while Plaintiffs and Class Members continue to have their rightful commission payments diverted to Klarna.

195. Klarna's unjust enrichment is traceable to, and resulted directly and proximately, from the conduct alleged herein, including by using the Klarna browser extension to wrongfully credit itself with referrals and commissions it did not rightfully earn.

196. The monies and benefits conferred upon, received, and enjoyed by Klarna were not conferred officiously or gratuitously, and it would be inequitable and unjust for Klarna to retain these benefits.

197. Equity and good conscience militate against permitting Klarna to retain the profits and benefits from its wrongful conduct, which should be restored to Plaintiffs and Class Members.

## VII. PRAYER FOR RELIEF

198. WHEREFORE, Plaintiffs seek that this matter be certified as a class action, and that their attorneys be appointed Class Counsel and that they be appointed Class Representatives, and Plaintiffs demand judgment against Defendant as follows:

a. Awarding Plaintiffs and the proposed Class and the Subclasses actual damages, statutory damages, restitution, disgorgement of profits, attorneys' fees and costs, and any other relief that may be permitted by law or equity pursuant to the claim(s) for relief;

b. Permanently enjoining Klarna from engaging in the misconduct alleged herein;

c. Awarding Plaintiffs and the proposed Class and Subclasses pre-judgment and post-judgment interest pursuant to the claim(s) for relief;

d. Awarding Plaintiffs and the proposed Class and Subclasses costs, expenses, and attorneys' fees as permitted by law;

e. Awarding Plaintiffs and the proposed Class and Subclasses further relief as the Court may deem just and proper under the circumstances.

## VIII. JURY DEMAND

199. Plaintiff demands a trial by jury on all issues so triable.

DATED this 13th day of June, 2025.

*s/ Daniel R. Karon*

Daniel R. Karon (0069304)
**KARON LLC**
631 W. St. Clair Ave.
Cleveland, OH 44113
Telephone: (216) 622-1851
dkaron@karonllc.com

Adam E. Polk (*pro hac vice*)
Simon S. Grille (*pro hac vice*)
Anthony Rogari (*pro hac vice*)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, California 94108
Telephone: (310) 877-7034
apolk@girardsharp.com
arogari@girardsharp.com

Gary M. Klinger (*pro hac vice*)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Telephone: (866) 252-0878
gklinger@milberg.com

Alexandra M. Honeycutt (*pro hac vice*)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
800 S. Gay St., STE 1100
Knoxville, TN 37929
Telephone: (866) 252-0878
ahoneycutt@milberg.com

E. Michelle Drake (*pro hac vice*)
**BERGER MONTAGUE PC**
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
Tel.: 612-594-5999
Fax: 612-584-4470
emdrake@bm.net

Norman E. Siegel (*pro hac vice*)
Barrett J. Vahle (*pro hac vice*)
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone: (816) 714-7100

siegel@stuevesiegel.com
vahle@stuevesiegel.com

***Attorneys for Plaintiffs***